USCA1 Opinion

 

 United States Court of Appeals United States Court of Appeals For the First Circuit For the First Circuit ____________________ No. 94-2283 THEODORE M. BARBOUR, Plaintiff, Appellant, v. DYNAMICS RESEARCH CORPORATION, Defendant, Appellee. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. William G. Young, U.S. District Judge] ___________________ ____________________ Before Torruella, Chief Judge, ___________ Cyr and Stahl, Circuit Judges. ______________ ____________________ Norman Jackman with whom Martha M. Wishart and Jackman & Roth ______________ __________________ _______________ were on brief for appellant. Joan Ackerstein with whom Guy P. Tully and Jackson, Lewis, ________________ ______________ ________________ Schnitzler & Krupman were on brief for appellee. ____________________ ____________________ August 15, 1995 ____________________ STAHL, Circuit Judge. Plaintiff Theodore M. STAHL, Circuit Judge. ______________ Barbour sued his former employer, Dynamics Research Corporation ("DRC"), claiming that DRC terminated his employment to avoid paying disability benefits, in violation of section 510 of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. 1140. The district court granted summary judgment for DRC, and we affirm. I. I. __ FACTUAL BACKGROUND FACTUAL BACKGROUND __________________ In July 1985, DRC, an Andover, Massachusetts company, hired Barbour as a staff engineer. Although Barbour was performing his job satisfactorily, his supervisor, Earl Zimmerman, began to complain to Barbour in September 1987 that Barbour's breath smelled of alcohol. Barbour and Zimmerman discussed Barbour's alcohol problem, and Zimmerman suggested that Barbour apply for a medical leave of absence.  For employees with a medically certified disability, DRC provides company-funded short-term disability benefits. The short-term disability plan provides a disabled employee with up to 75% of his or her salary. After six months elapses, an employee who is still disabled must then apply for long-term disability benefits, which are provided through a funded insurance program. DRC employees applying for short-term benefits receive two documents. The first, a Medical Leave of Absence -2- 2 Notice (the "Disability Notice") describes the employee's rights and responsibilities under the program and requires certain information and an employee signature.1 The second form, a Physician's Certification of Disability form (the "Certification Form") is to be completed by the employee's physician and returned to DRC's benefits office. The Disability Notice states that the employee  must submit a completed Physician's Certification of Disability form (or a comparable note on physician's letterhead). This must be received in the benefits office within 10 days of the date your leave commences or the date of this notice, whichever is later.  The ten-day requirement also appears in a memorandum dated July 1, 1987, from DRC's benefits administrator, Patricia Nickles, to department managers. The memorandum provides that [t]he employee has 10 days from the first day out to submit the signed medical leave letter and written medical certification to the Benefits office. If this timeframe is not met, a time card will not be processed . . . . On or around December 4, 1987, Barbour went to see DRC's vice president of human resources, John Wilkinson, to discuss the process of applying for short-term disability benefits. During his meeting with Wilkinson, Barbour received an undated Disability Notice and a Certification  ____________________ 1. The record does not indicate when and if this form was returned and neither party focuses on this document. -3- 3 Form. Barbour claims that Wilkinson told him the Disability Notice was undated in order to give him more time to obtain certification. On December 7, without any apparent employer permission, Barbour commenced his absence from work. On this same day, Barbour brought the Certification Form to the office of Dr. Kenneth Prescott, a hematologist who had been treating him for protracted bleeding. Dr. Prescott was on vacation but his nurse informed Barbour that the doctor would return on December 16 and would complete the form at that time. On December 10, Nickles sent a certified letter to Barbour, stating that unless the Certification Form was returned to her office by December 18 -- eleven days after Barbour commenced his leave -- she would assume he had chosen voluntarily to terminate his employment. This letter was never received by Barbour as it was incorrectly addressed. Although Nickles told Barbour about the letter during a December 15 phone conversation, Barbour claims that Nickles did not specifically tell him that he would be terminated if the certification was not received by December 18. Barbour states that Nickles told him that he would be receiving a form letter but that he should not "get shook" and that DRC "will work with you but keep in touch." On December 16, Dr. Prescott told Barbour that he was unwilling to sign the Certification Form and that it -4- 4 should be taken to a general practitioner. Because Barbour was not under the care of a general practitioner at that time, he experienced difficulty in obtaining an immediate appointment. Barbour says that he attempted to contact Wilkinson on December 16 to inform him of the delay, but claims that Wilkinson failed to return his phone calls. On December 22, Wilkinson called Barbour to ask about the status of the Certification Form. After learning that Barbour had yet to set up an appointment with a general practitioner, Wilkinson suggested that Barbour continue his efforts at obtaining certification and told him that "they would try to jump the hurdles." In the meantime, however, Nickles and Wilkinson decided to begin the termination process and on December 22 mailed a certified letter to Barbour stating that his employment was being terminated for failure to comply with the ten-day deadline. This letter too was mistakenly sent to the wrong address and was not received by Barbour until January 10, 1988. On December 30, Barbour finally saw Dr. Lawrence McCartin, a general practitioner. During the appointment, Dr. McCartin told Barbour that he was suffering from a number of alcohol-related disabilities, including hypertension. Barbour asked the doctor to indicate on the Certification Form that his disability was caused by hypertension as he did not want alcoholism documented in his personnel file. -5- 5 Barbour picked up the completed form from Dr. McCartin's office on December 31 and delivered it to DRC on January 4, 1988, the next business day. The form was stamped by Dr. McCartin and stated that Barbour was disabled "indefinitely" beginning December 18, 1987, due to hypertension. Upon receipt of the Certification Form, DRC proceeded to review Barbour's disability claim. On January 7, Nickles called Dr. McCartin's office and learned that Dr. McCartin had seen Barbour only once, on December 30, two weeks after Barbour s disability allegedly began. She also learned that Barbour had missed a follow-up appointment with Dr. McCartin scheduled for January 7. DRC claims that, based on these circumstances, along with the fact that Barbour had not listed alcoholism as the cause of disability, it chose not to accept the form as a valid certification of disability and did not reinstate Barbour. Nickles, in informing Barbour of DRC's decision by letter on January 7, stated: Unfortunately, I [Nickles] am unable to consider your claim for disability benefits. As you already know, it was your responsibility to submit this documentation by December 18, 1987. Since we did not receive your paperwork by this deadline, you were considered to have voluntarily terminated your employment with DRC retroactive to December 4, 1987.  The record indicates that Barbour was the first employee ever terminated for failure to submit the Certification Form within ten days and that Certification -6- 6 Forms of other employees were received by DRC after the deadline had elapsed (between three and twenty days late). These employees apparently were not terminated or denied disability benefits. The record also suggests that there were other instances in which employees turned in insufficient Certification Forms and it is not disputed that these employees were allowed to supplement their original forms, even though the ten-day period had expired.  After Barbour was terminated, he sought no medical treatment for a period of nine months. In August 1988, Barbour stopped drinking but continued to suffer from a number of alcohol-related illnesses. On April 5, 1991, the Social Security Administration adjudicated Barbour to have been disabled since December 4, 1987, the approximate date that his absence from work commenced. In June 1992, Barbour commenced this action in Massachusetts state court under section 510 of ERISA, 29 U.S.C. 1140, alleging that DRC terminated him in order to deprive him of disability benefits. DRC subsequently removed the case to the United States District Court for the District of Massachusetts. At the close of discovery, both parties moved for summary judgment. The district court granted DRC's motion, and Barbour thereafter filed a motion to reconsider. Upon the district court s refusal to reconsider, this appeal ensued. -7- 7 -8- 8 II. II. ___ DISCUSSION DISCUSSION __________ A. Summary Judgment Standard _____________________________ As always, we review a grant of summary judgment de __ novo. Like the district court, we view the facts in the ____ light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor. Woods v. _____ Friction Materials, Inc., 30 F.3d 255, 259 (1st Cir. 1994). ________________________ Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). As a prerequisite to summary judgment, a moving party must demonstrate "an absence of evidence to support the non-moving party's case." Celotex _______ Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving _____ _______ party has properly supported its motion for summary judgment, the burden shifts to the non-moving party, who "may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 ________ ___________________ (1986).  Even in an ERISA case "where elusive concepts such as motive or intent are at issue, summary judgment may be -9- 9 appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." Goldman v. First Nat'l Bank of _______ _____________________ Boston, 985 F.2d 1113, 1116 (1st Cir. 1993) (quoting Medina- ______ _______ Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. _____ __________________________ 1990)). Thus, Fed. R. Civ. P. 56(c) "mandates the entry of summary judgment . . . upon motion against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." Celotex, 477 _______ U.S. at 322. B. Proving an ERISA section 510 Case _____________________________________ 1. The Legal Framework ______________________ Section 510 of ERISA provides in part: It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan . . . for the purpose of interfering ______________________________ with the attainment of any right to which _________________________________________ such participant may become entitled _________________________________________ under the plan . . . .  _______________________ 29 U.S.C. 1140 (emphasis supplied). The ultimate inquiry in a section 510 case is whether the employment action was taken with the specific intent of interfering with the employee's ERISA benefits. Clark v. Coats & Clark, Inc., 990 _____ ___________________ F.2d 1217, 1222 (11th Cir. 1993); Biggins v. Hazen Paper Co., _______ _______________ 953 F.2d 1405, 1417 (1st Cir. 1992), vacated and remanded on _______ ___ ________ __ -10- 10 other grounds, 113 S. Ct 1701 (1993); McGann v. H & H Music _____________ ______ ___________ Co., 946 F.2d 401, 404 (5th Cir. 1991). This "specific ___ intent" requirement derives from the language of the ERISA statute ("for the purpose of interfering") and is necessary "to separate the firings which have an incidental, albeit important, effect on an employee's . . . rights from the actionable firings, in which the effect of the firing on the employer's . . . obligation was a motivating factor." Dister ______ v. Continental Group, Inc., 859 F.2d 1108, 1111 (2d Cir. ________________________ 1988). Thus, no ERISA cause of action will lie where the loss of benefits was a mere consequence of, but not a motivating factor behind, a termination of employment. Id. ___ Without such a requirement, every discharged employee could have a potential claim against his or her employer. In most cases, given that the employer controls the evidence related to intent, a plaintiff will be unable to adduce "smoking gun" evidence that the employer intended to interfere with his or her benefits. An employer is unlikely to document such a motive, and there is rarely "eyewitness testimony as to the employer's mental processes." Dister, ______ 859 F.2d at 1112 (quoting United States Postal Serv. Bd. of __________________________________ Governors v. Aikens, 460 U.S. 711, 716 (1983)). Therefore, a _________ ______ plaintiff usually must rely on circumstantial evidence to prove his or her case. -11- 11 Where a plaintiff must resort to such evidence, the burden-shifting analysis used in Title VII employment discrimination cases is especially helpful. It "enables the trial judge to sift through the evidence in an orderly fashion to determine the ultimate question in the case--did the defendant discriminate against the plaintiff." Dillon v. ______ Voles, 746 F.2d 998, 1003 (3d Cir. 1984). Accordingly, a _____ number of circuits have applied the McDonnell Douglas __________________ framework to section 510 claims. See, e.g., Humphreys v. ___ ____ _________ Bellaire Corp., 966 F.2d 1037 (6th Cir. 1992); Rath v. _______________ ____ Selection Research, Inc., 978 F.2d 1087 (8th Cir. 1992); _________________________ Conkwright v. Westinghouse Elec. Corp., 933 F.2d 231 (4th __________ _________________________ Cir. 1990); Dister, 859 F.2d at 1108; Gavalik v. Continental ______ _______ ___________ Can Co., 812 F.2d 834 (3d Cir. 1987). The district court ________ appropriately employed the framework in this case, and we now do the same in assessing the propriety of the court's grant of defendant's motion for summary judgment. a. Prima Facie Case ________________ In order to establish a prima facie case under section 510, a plaintiff must present sufficient evidence from which the employer's specific intent to interfere with the plaintiff's benefits can be inferred. Dister, 859 F.2d ______ at 1114-15. Thus, a plaintiff must show that he or she (1) is entitled to ERISA's protection, (2) was qualified for the position, and (3) was discharged under circumstances that -12- 12 give rise to an inference of discrimination. Id. at 1115. ___ As in the Title VII context, the plaintiff's burden of proof at this stage is de minimis. Id. at 1114-15. __ _______ ___ Applying this standard to the instant case, Barbour has met his initial burden of producing evidence to support each of the elements of his prima facie case. First, Barbour is a member of the protected class under the ERISA statute because he had the opportunity to attain a right under an employee benefit plan. Second, Barbour has provided evidence that he was performing satisfactorily in his job. DRC's performance evaluations indicate that Barbour met the characteristics of a "fully qualified experienced employee." Finally, Barbour was attempting to obtain disability certification when the employment action was taken and benefits, if granted, would have been paid from defendant's general funds. As the plaintiff's burden at the prima facie stage is de minimis, these circumstances are sufficient to __ _______ give rise to an inference that DRC terminated Barbour in order to interfere with his disability benefits. See Dister, ___ ______ 859 F.2d at 1114 (plaintiff's discharge four months before certain pension benefits were due to vest, together with the substantial cost savings to the employer in denying pension benefits, were sufficient to raise an inference of specific intent at the prima facie stage); Zappia v. Nynex ______ _____ Information, No. 90-11366-Y, 1993 WL 437676, at *3 (D. Mass. ___________ -13- 13 Oct. 22, 1993) (employee's discharge while receiving disability benefits gives rise to a presumption of intent at the prima facie stage).  -14- 14 b. Defendant's Non-Discriminatory Reason _____________________________________ Once the plaintiff establishes a prima facie case, a presumption arises that the defendant acted unlawfully in denying the plaintiff ERISA benefits. See St. Mary's Honor ___ ________________ Ctr. v. Hicks, 113 S. Ct. 2742, 2747 (1993) (Title VII). In ____ _____ Title VII cases, "[t]his presumption `places upon the defendant the burden of producing an explanation to rebut the prima facie case--i.e., the burden of producing evidence that the adverse employment actions were taken for a legitimate, non-discriminatory reason.'" Udo v. Tomes, No. 94-1931, slip ___ _____ op. at 7 (1st Cir. Apr. 28, 1995) (quoting Hicks, 113 S. Ct. _____ at 2747). In the ERISA context, this burden remains the same. Dister, 859 F.2d at 1115. Thus, the defendant must ______ establish a legitimate, "non-discriminatory" reason -- i.e., one unrelated to the plaintiff's entitlement to ERISA benefits -- for its actions toward the plaintiff. DRC claims that it terminated Barbour for failing to report to work or submit any medical certification of disability within ten days of the commencement of his leave. Although Barbour disputes the veracity of this justification, it is enough to satisfy DRC's "relatively light" burden. Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994). As the _______ _______ Supreme Court stated in Hicks, "the determination that a _____ defendant has met its burden of production (and has thus rebutted any legal presumption of intentional discrimination) -15- 15 can involve no credibility assessment. For the burden-of- production determination necessarily precedes the credibility ________ assessment stage." 113 S. Ct. at 2748 (emphasis in original). c. Barbour's Evidence of Pretext and Specific _______________________________________________ Intent ______ Once the defendant has met its burden of production, the presumption of intent established by the plaintiff's prima facie case "drops out of the picture." Hicks, 113 S. Ct. at 2749. The burden of production shifts _____ back to the plaintiff, who must prove that the defendant acted with the specific intent of interfering with the plaintiff's benefits. Id. Thus, in order to survive a ___ motion for summary judgment, a plaintiff must introduce evidence sufficient to support two findings: (1) that the employer's articulated reason for its employment actions was a pretext; and (2) that the true reason was to interfere with the plaintiff's receipt of benefits. See Udo, slip op. at 8 ___ ___ (citing Smith v. Stratus Computer, Inc., 40 F.3d 11, 16 (1st _____ _______________________ Cir. 1994), cert. denied, 115 S. Ct. 1958 (1995)). _____ ______ Barbour argues that Hicks precludes summary _____ judgment where there is sufficient evidence to conclude that the defendant's proffered reasons are a pretext. Barbour contends that under Hicks, where the plaintiff has _____ established a prima facie case and has shown that the -16- 16 employer's reasons are not worthy of credence, no additional proof of intent is required for the trier of fact to infer that the employer intended to interfere with the employee's benefits. Barbour bases his argument on the passage in Hicks _____ in which the Court stated that "[t]he factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination." Hicks, 113 S. Ct. at _____ 2749. Barbour's argument, however, was foreclosed by our decision in Woods, in which we interpreted the quoted passage _____ from Hicks to make clear  _____ that the Supreme Court envisioned that some cases exist where a prima facie case and the disbelief of pretext could provide a strong enough inference of actual discrimination to permit the factfinder to find for the plaintiff. Conversely, we do not think that the Supreme Court meant to say that such a finding would always be permissible . . . . The strength of the prima facie case and the significance of the disbelieved pretext will vary from case to case depending on the circumstances.  Woods, 30 F.3d at 261 n.3. Thus, whether the plaintiff relies solely on his prima facie case and evidence of pretext or has additional evidence of specific intent as well, the plaintiff must always adduce evidence sufficient for a ______ rational jury to conclude that the employer's action was motivated by an intent to interfere with ERISA benefits. -17- 17 Because Barbour relies largely on the same evidence to prove both pretext and specific intent, we now assess the sum of that evidence and explain why it is insufficient to carry Barbour's burden. Barbour points to several facts both disputed and undisputed that he claims could lead a reasonable juror to infer that DRC's motivation was to interfere with his receipt of disability benefits. Barbour contends that he was deliberately led into a situation in which DRC could use a non-existent rule to terminate him. As evidence of this, Barbour points to Wilkinson's provision of an undated Disability Notice on December 4 in order to give him more time to obtain certification, Nickles's alleged failure to state specifically that the Certification Form had to be returned by a particular date,2 and Wilkinson's instruction to Barbour on December 22 that he should continue with his efforts to obtain certification despite his difficulties. We fail to see how a rational jury could conclude from these facts that DRC deliberately misled Barbour into believing he could take as much time as he needed to submit the Certification Form. No reasonable employee would assume that  ____________________ 2. DRC disputes this allegation and claims that Nickles told Barbour on two occasions that the Certification Form was due in the benefits office by December 18. Even Barbour concedes that Nickles told him to return the form "as early as possible." Because this is a motion for summary judgment, however, we will review the facts in the light most favorable to Barbour.  -18- 18 he or she had an unlimited time period in which to justify an _________ absence. Here, the Disability Notice Barbour received stated very clearly that a certification of disability had to be provided no later than ten days from the date of the form or the commencement of the leave, whichever was later. Since the Disability Notice was undated, Barbour had unequivocal notice that his ten-day period began to run on December 7, when he voluntarily commenced his leave. That Wilkinson and Nickles told Barbour to continue with his certification efforts when it was apparent that he could not comply with the deadline does not in any way indicate a deliberate plan to mislead; to the contrary, it demonstrates that they were still willing to consider his claim. Barbour's own account of his conversation with Wilkinson on December 22 indicates that Wilkinson essentially told Barbour that DRC would see what it could do although he made no promises.3  ____________________ 3. With respect to our dissenting brother, his characterization of this conversation is but one in a series of skewed presentations of the evidence that, taken together, he argues would permit a rational jury to conclude that DRC managers conspired to "induce" Barbour to take medical leave and "lull" him into believing there would be no consequences for failing to return the medical forms on time. First, the dissent suggests that DRC had approved a "medical disability leave" when Barbour voluntarily began his absence from work on December 7. Infra at 24. Although DRC provided Barbour _____ with the proper forms, the record contains no support for the inference that Barbour's absence beginning on that day was approved or induced by DRC. Our brother finds further support for his conspiracy theory in the fact that on December 22, Barbour was "told [by Wilkinson] to continue to ____ __ ________ __ seek medical certification." Infra at 26. Barbour's own ____ _______ _____________ _____ notes, however, state that Wilkinson actually told him that -19- 19  ____________________ he should "keep going with the Dr. certificate and they would ___ ____ _____ try to jump hurdles," and that "we will see if we can salvage ___ __ ____ _______ this thing." Wilkinson's choice of words belies Barbour's assertion that DRC soft-pedaled the trouble he was in. The assertion is further belied by Barbour's own notes of his conversation with Nickles on December 15, in which he recorded that Nickles told him that he should not "get shook" by the form letter she had sent him, and by Barbour's December 18 message for Nickles in which he told her that he did not want to terminate. See infra at 25. Why should ___ _____ Barbour "get shook" at all by a form letter unless he knew it contained some kind of ominous warning? And, if Barbour had no idea that he was flirting with termination on December 18, __ ____ why did he leave a message for Nickles stating that he did "not want to terminate"? The particular inferences the dissent would permit the jury to draw from this (and other) evidence -- that DRC lured an unwary Barbour into a bureaucratic trap -- are patently unreasonable on this record. Similarly misleading is the dissent's suggestion that DRC's misaddressing of the December 10 letter to Barbour, and, in the dissent's underlined language, the fact that Nickles "did [not] ask for Barbour's correct mailing ___ ___ ___ ___ _________ _______ _______ address" when she spoke to him on December 15, were evidence _______ of nefarious doings. Infra at 24 n.1, 25. The December 10 _____ letter was addressed to Barbour at "P.O. Box 215, 88 Rogers." He had apparently stopped using the postal box; the street address, however, was correct. One cannot rationally infer __________ from this that Nickles intended that Barbour would not ________ receive the letter; the fact that Nickles put both addresses ____ on the envelopes -- with at least a reasonable probability that the postal service would direct the envelope to the correct address -- is mighty strong evidence of mistake and not deliberation. That Nickles failed to ask for Barbour's correct mailing address, simply in light of the fact that a letter sent a few day earlier had not arrived yet, is of even less evidentiary value; it proves absolutely nothing.  To cite a final example of the dissent's indefensible inference-drawing, we are at a loss to understand what possible weight is added to Barbour's case by the statements of Wilkinson's secretary to Barbour on December 31. Infra at 26. The dissent cites this as a _____ "vicarious admission," but of what? Even assuming that the secretary's statements concerned matters within the scope of her employment, what permissible negative inference could a rational jury draw from the fact that DRC "evinced its readiness to receive the medical form" even after Barbour had been formally terminated? Whatever inferential leap our -20- 20 Barbour also argues that the fact that the penalty of termination for failure to comply with the ten-day deadline is not stated in any of DRC's written policies is evidence that DRC fabricated the "policy" in order to interfere with his benefits. In support of this argument, Barbour directs us to the undisputed fact that he was the first employee ever terminated by DRC for failing to comply with the deadline. In addition, Barbour presents Certification Forms of other employees submitted after the deadline had elapsed and there is no evidence indicating that these employees were terminated or denied disability benefits for their late submissions.  Even viewing the facts in the light most favorable to Barbour, we agree with the district court that at most these facts show that DRC may have acted inconsistently in its application of the policy regarding employees who turned in their Certification Forms late. Such evidence, standing alone, is insufficient to demonstrate intent unless the inconsistent application is linked with a motivation to deprive the employee of benefits. See, e.g., Fong v. ___ ____ ____  ____________________ brother is making here escapes us. Contrary to the dissent's characterization of our holding, we do not mean to imply that the total assemblage of evidence compels a particular conclusion; rather, we hold _______ that the conclusion that Barbour would have a rational jury ________ draw -- namely, that DRC set Barbour up to apply for medical leave so that it could fire him, and then lied about it -- is impermissible based on this evidence.  -21- 21 American Airlines, Inc., 626 F.2d 759, 762 (9th Cir. 1980); _______________________ Teumer v. General Motors Corp., 840 F. Supp. 538, 548-50 ______ _____________________ (N.D. Ill. 1993) (holding that in an action under section 510 of ERISA, the plaintiff cannot show pretext simply by demonstrating that the defendant applied its recall policy in an inconsistent manner, but must adduce facts that allow the court to infer that the defendant had the specific intent of interfering with plaintiff's benefits), aff'd, 34 F.3d 542 _____ (7th Cir. 1994). Here, we do not believe that specific intent can be inferred from the fact that Barbour was the first employee ever terminated for missing the ten-day deadline. The Disability Notice clearly states that an employee must ____ provide medical certification within ten days; as we stated above, no reasonable employee would assume that he or she had an unlimited time in which to provide it. The summary judgment record indicates that DRC's decision not to terminate other employees who submitted Certification Forms late were based on extenuating circumstances absent from this case. For example, DRC had previously extended the deadline when an employee's physician contacted DRC and advised it that he or she would be unable to complete the form within the specified time period. Similarly, extensions were also granted where an employee was hospitalized and unable to complete the form in a timely manner. -22- 22 In this case, DRC was never contacted by a physician regarding Barbour's illness, and Barbour was not hospitalized. Having received the Disability Notice clearly notifying him of the ten-day deadline, Barbour then failed to obtain an appointment with a physician willing to sign the form until December 30. While the delay in obtaining a doctor's signature may not have been entirely his fault, it was Barbour's choice to begin his absence on December 7, _________ without any assurance that he would obtain certification of disability within ten days. By December 22, DRC had not received any certification of disability and Barbour had informed Wilkinson that no future doctor's appointment had been arranged. It was this circumstance that caused DRC to mail the December 22 termination letter to Barbour. An employer need not remain idle indefinitely while an employee is absent without excuse. While DRC may have chosen not to discharge other employees for missing the certification deadline, Barbour's case does not present similar extenuating circumstances and, therefore, specific intent cannot be inferred from DRC's actions. Cf. Stratus, 40 F.3d at 17 ___ _______ (Title VII plaintiff alleging disparate treatment must show that he or she was treated differently from persons similarly situated in all relevant aspects). In addition, DRC's actions when Barbour finally did submit certification make Barbour's claim of unlawful -23- 23 motivation even more implausible. Despite Barbour's failure to comply with express company policy, DRC nevertheless reviewed Barbour's disability claim on January 7. Although the form was submitted over two weeks late, Nickles called Dr. McCartin to inquire about the listed disability of "hypertension." Based on what she learned in that conversation, DRC chose not to accept Barbour's form as a valid certification of disability.4 Even if DRC was mistaken in its evaluation of Barbour's disability, as long as that determination was in good faith and formed the basis of the decision it is permissible under section 510. Zappia, ______ 1993 WL 437676 at *3. Barbour has failed to produce any evidence of bad faith. Barbour next argues that specific intent can be inferred from the mere fact that DRC knew he was in the process of applying for benefits at the time of termination. It is undisputed that Barbour informed Wilkinson on or around December 4 that he was considering applying for disability  ____________________ 4. In fact, DRC set forth five justifications for its decision to deny Barbour's disability claim: (1) Dr. McCartin did not see Barbour until December 30, two weeks after the disability allegedly began; (2) the condition listed on the form, "hypertension," was different than the alcohol problem or bleeding condition which was expected given Barbour's previous statements to DRC supervisors; (3) Barbour appeared to have been "shopping around" for a physician after Dr. Prescott refused to complete the form; (4) the length of disability (undetermined) did not coincide with medical guidelines; and (5) Barbour failed to keep his follow-up appointment with Dr. McCartin scheduled for January 7.  -24- 24 leave. It is also undisputed that during their discussion, Barbour and Wilkinson discussed the odor of alcohol on Barbour's breath and the possibility of an alcohol problem. However, these facts add little to Barbour's proof: "[E]ven if [Barbour] could establish that [DRC] knew that [Barbour] definitely planned to apply for . . . disability benefits, he would still be required to offer some evidence that this knowledge somehow influenced" DRC's employment actions. Corcoran v. GAB Business Servs., Inc., 723 F. Supp. 966, 971 ________ __________________________ (S.D.N.Y. 1989). As was the case in Corcoran, Barbour has ________ failed to produce any evidence suggesting that the prospect of paying disability benefits influenced DRC's decisions. To the contrary, we find it significant that the option of a medical leave of absence was first suggested by DRC. Barbour's supervisor, Zimmerman, approached Barbour and suggested that he apply for a medical leave to address his alcohol problem. Prior to their discussion, Barbour was unaware that he would even qualify for disability benefits. We think it is highly unlikely that DRC would have suggested such an option if it ultimately intended to deprive Barbour of benefits: DRC had no way of knowing that Barbour would fail to submit the proper documentation. Barbour finally suggests that a factfinder could infer unlawful intent if DRC imposed criteria on Barbour that were harsher than that imposed on other employees whose -25- 25 illnesses were less likely to lead to permanent long-term disability. Even if such an inference would be permissible, Barbour has produced no evidence that his illness was more likely to lead to long-term disability. In fact, the evidence strongly suggests that DRC would have granted Barbour disability benefits had he submitted appropriate documentation of his alcohol condition. In 1987 and 1988, DRC provided disability benefits to all seventy-six other employees who applied for disability benefits. Of these, at least sixteen employees applied for and received disability benefits for conditions related to the abuse of alcohol. In sum, we hold that Barbour has failed to present evidence that would enable a reasonable jury to conclude that DRC's actions were motivated by a desire to interfere with Barbour's benefits. III. III. ____ CONCLUSION CONCLUSION __________ Because Barbour has failed to raise an issue of fact as to whether DRC intended to interfere with his ERISA benefits, the district court properly granted summary judgment in favor of DRC on Barbour's ERISA claim. Affirmed. _________ -26- 26 Dissent follows. -27- 27 CYR, Circuit Judge (dissenting). The court aptly CYR, Circuit Judge (dissenting). ______________ acknowledges, supra at p. 15, that an inference of _____ intentional discrimination is "particularly" appropriate where a "finding of pretext is accompanied by a suspicion of mendacity," Hicks, 113 S. Ct. at 2749, but then abandons _____ basic summary judgment procedure en route to its holding that fair findings of pretext and suspicion of mendacity are precluded on the present record. Allowed their rightful role, the incumbent requirements that all credibility assessments and fair inferences be indulged favorably to the party resisting summary judgment, Woodman v. Haemonetics _______ ___________ Corp., 51 F.3d 1087, 1091 (1st Cir. 1995), do not admit of _____ the findings the court deems compelled.  _________ Conspicuously affected by alcoholism and in poor health, Barbour had used much of his sick leave by December 4, 1987. On that day, his supervisor, Earl Zimmerman, called Barbour aside and asked whether he had considered taking long-term medical disability leave ("medical disability leave"). Upon learning that Barbour had never considered it, Zimmerman urged him to do so: "It's a good deal, and I don't see why you shouldn't qualify for it. I really would like to call John Wilkinson [DRC vice-president for human resources] . . . and tell him you are on the way down to see him and do that."  -28- 28 On Zimmerman's advice, Barbour went to see Wilkinson, who handed him an undated medical disability leave _______ form to be returned "within 10 days of the date your leave commences or the date of this notice, whichever is later." __ _____ (emphasis added). The form itself made no mention that failure to file on time could result in termination, nor did Wilkinson ever mention that it should be returned by a date certain. On December 7, Barbour went on medical disability leave. Three days later, Patricia Nickles, the benefits administrator for DRC, mailed a certified letter warning that Barbour could be terminated if he did not return the enclosed medical certification form (dated December 10) by December 18. As the letter was misaddressed, Barbour never received it.5  There is no record evidence that DRC had ever terminated or threatened to terminate an employee for failing to comply with the ten-day filing provision. Rather, on at least ten occasions DRC had accepted late medical certification forms. Moreover, this marked the first time  ____________________ 5. Although DRC had the correct street address, the letter had been addressed to a post office box (as well as a street address) which Barbour had relinquished sometime after he moved in 1984.  -29- 29 that any DRC employee had ever been threatened with adverse action before the ten-day filing period had expired.6 On December 15, Barbour called to advise Nickles that he had been unable to return the medical form because his physician had been on vacation. During their conversation, Barbour informed Nickles that he had never received a certified letter dated December 10. In response, Nickles simply reassured Barbour that a "form letter [had been] sent out. Don't get shook. We will work with you but keep in touch." She never mentioned that failure to return the completed form within the next three days could, let alone would, lead to Barbour's termination. Moreover, though she knew Barbour had never received the December 10 letter ________ warning that termination could result unless the form were returned by December 18, Nickles neither mailed nor handed Barbour another copy, nor did she ask for Barbour's correct ___ ___ ___ ___ ___ _________ _______ mailing address.  _______ _______ On December 16, Barbour's physician, a specialist in hematology, advised him that the certification form should be completed by a general practitioner. Although Barbour left telephone messages with John Wilkinson's office, so informing him, the calls were never returned. Two days  ____________________ 6. On one other occasion, in early 1988, DRC warned an employee nineteen days after the ten-day period had elapsed. _____ Thus, the record supports a fair inference that the ten-day provision was being applied inconsistently or selectively at or about the time Barbour was terminated.  -30- 30 later, on December 18 unbeknownst to Barbour the deadline ________ for filing the medical form he left a telephone message for Nickles: "If you don't reach [me] this morning, [I'll] get to you this afternoon. Having trouble getting doctor's signature. [Don't] want to terminate." (emphasis added). _____ ____ __ _________ On December 21, after conferring with Wilkinson, _____ __________ ____ _________ Nickles telephoned to tell Barbour that he had been terminated for failure to return the medical forms by December 18. During their telephone conversation, Barbour volunteered his correct mailing address. On December 22, Nickles mailed Barbour a notice of voluntary termination _________ ___________ based on his failure to return the required medical form by December 18. That same day, in the belief that Wilkinson, rather than Nickles, had the authority to act in behalf of DRC, Barbour contacted Wilkinson and was told to continue to _________ ____ __ ________ __ seek medical certification. ____ _______ _____________ On December 30, Barbour was examined by a general practitioner, who diagnosed hypertension. At 9:45 a.m. the following day, Barbour was advised by the doctor's office that the signed medical certification form could be picked up. Barbour immediately informed Wilkinson, through his ________ _________ secretary, that the form had been signed. The record is silent as to whether he told the secretary that he did not yet have the form in hand. The secretary told Barbour that was "fine" and Barbour should "bring [the] form over today." ____ -31- 31 (emphasis added). Thus, as late as December 31, DRC had evinced its readiness to receive the medical form. See id. ___ ___ at 1094 (vicarious admissions by employee).  Barbour did not pick up the form on December 31, due to car trouble. When he called DRC during the afternoon of December 31 to explain the delay, no one answered the telephone. Due to the New Year holiday, the medical certification form was not received by Barbour until January 4, 1988, the next business day. He delivered it to DRC the same day. Yet on January 7, after conferring with Wilkinson, _____ __________ ____ _________ Nickles sent a certified letter to Barbour informing him that his claim for medical benefits would not be considered _____ ___ __ __________ because Barbour had failed to comply with the ten-day filing provision.7 On January 10, 1988, Barbour finally received the missent termination letter dated December 22, 1987. A rational factfinder reasonably could infer from the foregoing evidence that DRC not only induced Barbour to take medical disability leave but that it utilized its hitherto dormant ten-day filing provision as a pretext for  ____________________ 7. Notwithstanding its categorical notification to Barbour that the disability benefits application would not be considered, DRC now contends on appeal that it was considered and rejected on the basis of late submission and because the ___ _______ ___ disability claim was based on hypertension, not alcoholism. __________ _____ ___ _____ __ ____________ ___ __________ Should this belated representation be credited by the factfinder, it could buttress the inference that failure to file the form within ten days was not the true motive for ____ terminating Barbour. In these circumstances, Barbour need demonstrate no more at summary judgment. See Woodman, 51 ___ _______ F.3d at 1094.  -32- 32 terminating Barbour after it had misled and lulled him into believing that the ten-day provision would not be enforced as ___ a ground for termination, all in order to avoid liability for an ERISA-based medical disability claim. See id. at 1094.  ___ ___ First, short of ignoring the summary judgment prescripts that all credibility assessments and reasonable inferences are to favor Barbour, see id. at 1091, it cannot ___ ___ be inferred that Barbour was ever informed, until after the _____ _____ ___ ten-day period had expired, that his employment could be  _______ ______ ___ _______ let alone would be terminated for tardiness in filing the __________ medical certification form. On the other hand, the trier of fact reasonably could infer from Barbour's initial conversation with John Wilkinson, at which time Barbour was handed an undated medical certification form, that Wilkinson implicitly assured him that the ten-day provision would not be enforced against him. Such an inference is strengthened by the December 15 statement Nickles made to Barbour, that though a certified letter had been sent to Barbour, he should not "get shook. We will work with you but keep in touch."  Second, even after Barbour was notified that he had been terminated, he received decidedly mixed signals from DRC. Although Nickles informed him that he had been terminated, her superior Wilkinson as late as December ________ 31 held open the prospect that DRC would accept the medical form. Not until January 10, 1988, when he finally received -33- 33 the misaddressed December 22, 1987, termination letter, and the January 7 letter informing him that the disability claim application would not be considered, was Barbour unambiguous- ly informed of the consequences of failing to comply with the ten-day provision. By then, of course, it was too late.  Finally, the bald statement in the December 22 termination letter that DRC had presumed based on his ________ failure to return the medical forms that Barbour had voluntarily terminated his employment, notwithstanding his ___________ __________ flat advice to the contrary on December 18, see supra p. 4, ___ _____ and his ongoing efforts to obtain medical certification at DRC's suggestion, imperatively bespeaks pretext and mendacity with sufficient clarity to demonstrate that the inferences relied on by DRC, and endorsed by the majority, are not compelled.8  _________ Since it cannot be demonstrated without indulging impermissible inferences and credibility assessments that a rational factfinder would be compelled _________ to find that DRC did not actively encourage Barbour to take __ ____ ___ ___ medical disability leave before obtaining medical certification, then lull him into the fateful belief that  ____________________ 8. The spirited argument advanced by the court in defense of the inferences it deems compelled, see supra note 3, ___ _____ necessarily presumes that the employer's undeniably ambivalent conduct can only have been activated by the innocent intent and motives ascribed to it by the court an exercise appropriately reserved for the factfinder. -34- 34 strict compliance with its ambivalent ten-day filing policy would not be enforced, id. at 1094-95 (prima facie case, ___ _____ _____ combined with showing of pretext and suspicion of mendacity, precludes summary judgment on issue of intentional discrimination); see generally, Hicks, 113 S. Ct. at 2749, ___ _________ _____ 2749 n.4 & 2756 (where plaintiff adduces enough competent evidence to support inference of discrimination, the case must go to the trier of fact), I respectfully dissent. _ ____________ _______ -35- 35