**Manoochehr Fallah MOGHADDAM, et al., Plaintiffs,**

v.

**DUNKIN' DONUTS, INC., Defendant.**

No. CIV.A. 02–11794–PBS.

United States District Court, D. Massachusetts.

June 10, 2004.

Dunkin' Donuts Incorporated was represented in this action by Robert L. Zisk, Jeffrey L. Karlin, Christopher J. Wallace, and Roland B. Ninomiya of the law firm of Schmeltzer, Aptaker & Shepard, P.C. in Washington, D.C., as well as by Robert A. Murphy of Casner & Edwards, LLP, in Boston Massachusetts.

Plaintiffs were represented by Robert Zarco, Robert F. Salkowski, and Himanshu M. Patel of the law firm of Zarco Einhorn & Salkowski, P.A., in Miami, Florida.

### MEMORANDUM AND ORDER

SARIS, District Judge.

### I. INTRODUCTION

Plaintiff franchisees allege in their Second Amended Complaint that defendant Dunkin' Donuts, Inc. ("Dunkin'") violated its Franchise Agreement by diverting to its own account monies recovered through loss prevention activities. Plaintiffs claim Dunkin' should have deposited these amounts into the Dunkin' Donuts Franchise Owners' Advertising and Sales Promotion Fund (the "Fund"), and seek damages for breach of contract and breach of the implied covenant of good faith and fair dealing. They also seek specific performance compelling Dunkin' to deposit all advertising monies recovered through loss prevention activities into the Fund. Defendant moves for summary judgment on all counts. After hearing, defendant's motion for summary judgment is *ALLOWED.*

### II. FACTUAL BACKGROUND

The Court assumes familiarity with the factual allegations set forth its prior opinion in this litigation. *See Moghaddam v. Dunkin' Donuts,* 295 F.Supp.2d 136 (D.Mass.2003). The following facts are relevant to this Order, and are undisputed except where otherwise noted.

Under most Dunkin' franchise agreements, franchisees pay Dunkin' an advertising fee and a franchise fee each week based on a percentage of the franchisee's gross sales for that week. (Wilson Aff. at ¶ 6.) Under the Franchise Agreement at issue in this case, the advertising fee is 5.0% of the gross sales, and the franchise fee is 4.9% of gross sales. (Agreement at ¶¶ E, F.)

Pursuant to Section 3.5 of the Franchise Agreement, Dunkin agrees:

> To administer the Dunkin' Donuts Franchise Owners Advertising and Sales Promotion Fund (the "Fund") and to direct the development of all advertising and promotional programs. That portion of FRANCHISEE's advertising contribution equal to one percent (1%) of the Gross Sales of the Shop will be utilized, at the discretion of DUNKIN' DONUTS, to provide for the administrative expenses of the Fund and for programs designed to increase sales and enhance and further develop the public reputation and image of DUNKIN' DONUTS and the Dunkin' Donuts System. The balance, including any interest earned by the Fund, will be used for advertising and related expenses. Contributions to the Fund in excess of the percentage of Gross Sales set forth in Item "F" of the Contract Data Schedule shall be used in accordance with the programs to which they relate. The content of all advertising, as well as the media in which the advertising is to be placed and the advertising area, shall be at the discretion

of DUNKIN' DONUTS. DUNKIN' DONUTS undertakes no obligation to insure that any individual franchisee benefits directly or on a pro rata basis from the placement, if any, of advertising in local markets. Upon request, DUNKIN' DONUTS will provide FRANCHISEE a statement of receipts and disbursements of the Fund, prepared by an independent certified public accountant, for each fiscal year of the Fund.

Section 6.2 provides:

DUNKIN' DONUTS representatives shall have the right to examine FRANCHISEE's original books, records and supporting documents at reasonable times and to perform such inspections, tests and analyses as it deems appropriate to verify Gross Sales. If an examination reveals that the Gross Sales reported by FRANCHISEE to DUNKIN' DONUTS are less than the Gross Sales ascertained by the examination, then FRANCHISEE shall immediately pay to DUNKIN' DONUTS any amounts owing to DUNKIN' DONUTS and the Fund and DUNKIN' DONUTS' rental subsidiary based upon the corrected Gross Sales. If an examination results from FRANCHISEE's failure to prepare, deliver or preserve statements or records required by Paragraph 5.2 of this Agreement, or if an examination of FRANCHISEE's records results in the discovery of a discrepancy greater than three percent (3%) in the Gross Sales reported by FRANCHISEE, FRANCHISEE shall pay or reimburse DUNKIN' DONUTS for any and all expenses connected with the examination, including, but not limited to, reasonable accounting and legal fees, the unpaid amounts owed to DUNKIN' DONUTS, its rental subsidiary and the Fund, and interest thereon from the date payment was due at 18% per annum or the highest permissible rate. Such payments will be without prejudice to any other remedies DUNKIN' DONUTS may have under this Agreement, including the right to terminate this Agreement, without opportunity to cure, in the case of intentional under-reporting of Gross Sales.

## III. DISCUSSION

"Summary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Barbour v. Dynamics Research Corp.*, 63 F.3d 32, 36 (1st Cir.1995) (quoting Fed. R.Civ.P. 56(c)). "To succeed [in a motion for summary judgment], the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir.1990); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

"Once the moving party has properly supported its motion for summary judgment, the burden shifts to the non-moving party, who 'may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial.'" *Barbour*, 63 F.3d at 37 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "There must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted.'" *Rogers*, 902 F.2d at 143 (quoting *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505) (citations and footnote in *Anderson* omitted). The Court must "view the facts

in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Barbour,* 63 F.3d at 36.

According to Dunkin', under Section 3.5 of the Franchise Agreement, the Fund must limit the amount spent on administrative costs to 20% of the total franchisee contributions to the fund in a given year.[1] While Dunkin' argues it has the discretion to spend the entire 20% on loss prevention activities—even those that do not affect the Fund—it states that it does not use any Fund monies to pay the costs of loss prevention activities, but instead has voluntarily assumed the costs of its loss prevention program. Dunkin' also agreed at oral argument that if in any particular year there is net income remaining after the costs of loss prevention activities are taken out of the amount of advertising fees recovered from underreporting franchises, it would deposit that income into the advertising fund.[2]

Plaintiffs argue that Section 3.5 does not necessarily contemplate that defendant has the right to charge the advertising fund up to 20 percent for costs related to loss prevention activity, and that the Franchise Agreement specifically contemplates that Dunkin' alone, not the Fund, would incur the expense of loss prevention activities. They rely on Section 6.2 of the Franchise Agreement, which provides, in relevant part:

> [I]f an examination of FRANCHISEE's records results in the discovery of a discrepancy greater than three percent (3%) in the Gross Sales reported by FRANCHISEE, *FRANCHISEE shall pay or reimburse DUNKIN' DONUTS for any and all expenses connected with the examination,* including, but not limited to, reasonable accounting and legal fees, the unpaid amounts owed to DUNKIN' DONUTS, its rental subsidiary and the Fund, and interest thereon from the date payment was due at 18% per annum or the highest permissible rate.

(emphasis added). Plaintiffs argue that if Dunkin' had intended to share its loss prevention costs and expenses with the Fund, this section would have required the Franchisee to reimburse not only Dunkin' Donuts for expenses connected with the examination, but also the Fund. Plaintiffs also argue that even if defendant is able to charge the Fund for its share of expenses associated with its loss prevention activities, only 20% of the advertising contributions recouped from the *particular* underreporting recalcitrant franchisee may be used for that purpose, not 20% of the entire Fund.

■ Both sides have taken unreasonable positions. Dunkin' incorrectly construes the agreement to permit it to pay all the costs of *unrelated* loss prevention activities out of the Fund's administrative expenses. That expenditure would violate the duty of good faith and fair dealing. Plaintiffs argue that under the Franchise Agreement the Fund is precluded from paying for its proportionate share of the costs related to receipt of unpaid advertising fees. Nothing in the agreement specifically prohibits Dunkin' from exercising its discretion to allocate administrative expenses of the Fund for loss prevention

---

[1]. See Wilson Aff. at ¶ 24 ("Because each franchisee is required to contribute approximately 5% of his or her gross sales to the Fund, 1% of the franchisee's gross sales constitutes about 20% of his or her advertising contribution.").

[2]. Dunkin' has submitted evidence that it has never exceeded the 20% ceiling on administrative costs—even if this figure includes all loss prevention expenses relating to investigations of Dunkin's underreporting franchisees. (*See* Table 2, Wilson Aff., ¶ 28.)

related to advertising (subject, of course, to the 20 percent cap).

■ In any event, whether or not Dunkin' could pay for loss prevention activities out of the Fund's administrative expenses is an academic debate because Dunkin' does not, in fact, pay for any costs of collection out of the Fund. The key question, then, is how to allocate the costs of collecting unpaid advertising fees through the loss prevention program. Again both sides take unreasonable legal positions. Plaintiffs rely on Paragraphs 3.5 and 4.4 of the Franchise Agreement for their argument that Dunkin' is obligated to pay all advertising fees collected through loss prevention activities to the Fund, regardless of the expenses incurred in collection. Dunkin' disputes that it has any obligation whatsoever to contribute to the Fund the unreported advertising fees that it ultimately collects, but argues that in any event, any recoveries it obtains are far less than the costs it incurs to recover these unreported fees, leaving no net recovery to contribute to the Fund. I agree with Dunkin' that it must only repay advertising fees to the Fund after a fair allocation of the costs of collection. However, it would be a breach of good faith and fair dealing not to repay into the Fund any net advertising fees (after costs) recouped.

■ The only remaining issue involves bean-counting. The parties continue to dispute whether Dunkin' failed to repay even net advertising fees recouped under the loss prevention program. Because the record as it existed at the summary judgment hearing was unclear, at the Court's request, after the hearing, Dunkin' submitted the evidence in the form of calculations performed by Jennie Wilson, the Vice President and Chief Financial Officer of Allied Domeq Quick Service Restaurants (ADQSR), an organization consisting of the field and support staffs of Dunkin', Bas-

kin–Robbins and Togo's Eateries. This accounting shows that the costs expended in recovering advertising fees from underreporting Dunkin' franchisees exceed the actual recovery of advertising fees for each of the years 1996–2003. (*See* Table 1, Wilson Aff. at ¶ 21.) Therefore, Dunkin' argues, there has been no net income to deposit into the Fund and no liability on Dunkin's part for failing to do so. (Def.'s Supp. Mem. at 5.)

Plaintiffs attempt to create a factual dispute by pointing out inconsistencies between the restitution amounts identified by Charles Reno, Senior Executive of the Loss Prevention Department (Ex. B to Reno Aff.), and those mentioned in an internal Dunkin' Donuts memorandum, dated July 12, 2000 (Ex. 2 to Salkowski Aff., filed under seal). The Dunkin' memo fails to raise a genuine issue of material fact because the memo acknowledges that its figures are approximate estimates, "calculated identifying franchises fees, advertising fees, rent, interest, etc." The memo further states: "It would take some time to review the records of each [Loss Prevention Consultant] to determine how much of a final settlement would have been strictly for advertising fees." (*Id.* at 3.) The figures in both documents are also inconsistent with the figures submitted post-hearing in the Declaration of Jennie Wilson. Plaintiffs have not contested Ms. Wilson's calculations, have not requested an opportunity to take Ms. Wilson's deposition post-hearing, have submitted no expert testimony of their own, and do not seek an accounting. Indeed, they apparently cancelled their deposition with the assistant controller and failed to conduct discovery on the amount of money that they claim should have been placed in the Fund. Accordingly, plaintiffs have failed to introduce sufficient evidence to create a genuine issue of material fact concerning

their allegations of a breach of contract that caused them harm.

### ORDER

Defendant's motion for summary judgment (Docket No. 55) is **ALLOWED.**