**Elizabeth PARISEAU, Plaintiff**

v.

**THE CITY OF BROCKTON, Nancy Leedberg and Tedeschi Food Shops, Inc., Defendants**

**Mary Diaz, Plaintiff**

v.

**The City of Brockton and Nancy Leedberg, Defendants**

**Nos. CIV. A. 99–12664–PBS, CIV. A. 00–10010–PBS.**

United States District Court, D. Massachusetts.

April 3, 2001.

---

Kevin J. Reddington, Law Offices of Kevin J. Reddington, Brockton, for Elizabeth Pariseau.

Ronald L. Garrison, Lee Garrison, Bridgewater, MA, for Mary Diaz.

Douglas I. Louison, Merrick and Louison, Boston, MA, for City of Brockton and Nancy Leedberg.

James G. Bynoe, Latronico & Whitestone, Michael J. Johnson, Latronico & Whitestone, Boston, MA, for Tedeschi Food Shops.

## MEMORANDUM AND ORDER

SARIS, District Judge.

### I. INTRODUCTION

Plaintiffs claim that they were deprived of equal protection of the laws when Officer Nancy Leedberg of the Brockton Police Department failed to dispatch a cruiser in response to their 911 telephone call reporting that a robbery of Tedeschi's Food Shop at 17 Pearl Street, Brockton, Massachusetts was imminent. Plaintiffs assert claims pursuant to 42 U.S.C. § 1983 and state law,[1] seeking damages caused by the robbery, which would have been prevented if the police had been dispatched in a timely manner.

Defendants Brockton and Leedberg move for summary judgment on the grounds, among other things, that the police have no duty to protect citizens from private violence under *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 197, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). Defendant Tedeschi also moves for summary judgment against Plaintiff Pariseau.

After a hearing, the Court *ALLOWS* Brockton and Leedberg's Motion for Summary Judgment on the equal protection claim and *DISMISSES* without prejudice the state law negligence claims.

### II. BACKGROUND

■ On a motion for summary judgment, the Court must "view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Barbour v. Dynamics Research Corp.*, 63 F.3d 32, 36 (1st Cir. 1995). Therefore, the Court recites the relevant facts as they favor Plaintiffs' version of the events at issue.

On January 27, 1997 at approximately 10:25 p.m., Elizabeth Pariseau drove into the parking lot of a convenience store owned by Tedeschi Food Shops, Inc. at 17 Pearl Street in Brockton, Massachusetts. She intended to make purchases on her way to work. Upon entering the parking lot, she observed three black males standing in front of the store. These individuals were lifting their hoods over their heads and wrapping winter scarves around their faces. When Pariseau pulled into a parking space and turned off her car, the men quickly got into their car and remained there as Pariseau entered the convenience store. Based on the seemingly furtive actions of these men, Pariseau suspected that they intended to rob the store and immediately informed the store clerk, Mary Diaz, of her misgivings. Pariseau advised Diaz to call the police at once, which Diaz did by dialing 911.[2]

A civilian telephone operator ("CTO") received the 911 call at 10:26 p.m. Diaz

---

1. Plaintiffs' complaints allege that they were discriminatorily denied police services on the basis of race by the City of Brockton and Officer Leedberg (Pariseau & Diaz Compls. Counts I and II); that the City of Brockton provided negligent training and supervision of Officer Leedberg (Pariseau & Diaz Compls. Count III); and that the City of Brockton, as the public employer of Officer Leedberg, is responsible for her negligent failure to dispatch police services (Pariseau & Diaz Compls. Count V). In addition, Plaintiff Elizabeth Pariseau brings a state law claim against Defendant Tedeschi Food Shops, Inc. ("Tedeschi") for negligence in maintaining a safe environment for business invitees. (Pariseau Compl. Count VI.)

2. Though she was carrying a cellular phone, Pariseau opted not to call the police from her car outside the convenience store. She believed that her presence in the store would

turned the phone over to Pariseau to explain her observations of the three black males in the parking lot. Though both callers expressed fear that a robbery by the men waiting in their car was imminent, the CTO classified the complaint in the computer-aided dispatch system ("CAD system") as "CHK MOTORIST SUSP-," meaning that there was a suspicious motorist in the area. (CAD System Record of 1/27/97, 10:26PM.) As it was programmed to do, the computer system automatically designated this type of complaint as "Priority: 2." (*Id.*) In the portion of the complaint entry designated for narrative information, the CTO typed "3 BLK MALES IN WHT MV IN FRONT OF TEDESCIS ....... HAD ON HOODS .. 33 THOUGHT THEY SHOULD BE CHECKED." (*Id.*) The CTO's notation conveyed that the complainant had reported that three black males wearing hoods were in a white motor vehicle in front of Tedeschi's and that the complainant believed a patrol officer should be sent to check these individuals.

The complaint information was received instantaneously in the dispatch control room of the Brockton Police Department ("BPD") where two police officers, Nancy Leedberg and Jen Hayes, were responsible for assigning complaints for investigation to police officers cruising in patrol cars nearest the complaint locations.[3] When the complaint from Tedeschi's appeared on the computer screen in the dispatch control room, Officer Hayes read the narrative and brought the call to Officer Leedberg's attention. Officer Leedberg

responded, "Fuck them.... People who see black people with hoods on they think they're no good," and refused to dispatch a cruiser to the scene. (DiCarli Dep. Tr. at 35.)

Meanwhile, at Tedeschi's Food Shop, the three suspicious men, armed with at least one knife, ran into the store, shouting profanities and instructions at Pariseau and Diaz, such as "Put your fucking heads down.... Open the fucking register now." (Diaz Dep. Tr. at 53.) In the course of the heist, Plaintiffs were pushed, threatened at knife-point, robbed of their own money and personal effects, and generally terrorized. The robbers cut short their spree only when they mistakenly believed that a customer driving into the parking lot was a police officer. Shortly after the robbers fled the store, Pariseau placed a second call to the BPD at 10:30 p.m. by dialing 911.

Although three cruisers were available to respond to Plaintiffs' initial 911 call to the BPD, CAD system records show that a patrol officer was not dispatched to Tedeschi's until 10:33 p.m.—seven minutes after the first call reporting suspicious persons outside the store and three minutes after the second call reporting that the robbery had occurred. BPD records further reflect that the cruiser did not arrive on the scene until 10:44 p.m., eleven minutes after the dispatch.

## III. DISCUSSION

### A. Summary Judgment Standard

■ Summary judgment is appropriate when "the pleadings, depositions, an-

---

deter the would-be robbers who she believed were waiting to catch the store clerk alone.

**3.** It is unclear whether Officer Leedberg was the primary dispatcher, distributing complaints to patrol cars for investigation, or the alternate, responsible for running information on license plates, registrations, and warrants;

setting up car tows; and operating the teletype. Officer Leedberg claims that she was the alternate (Leedberg Dep. Tr. at 48), while Lieutenant Robert J. DiCarli, the shift commander at the BPD on the evening of January 27, 1997, recalls that Leedberg was the primary dispatcher (DiCarli Dep. Tr. at 14,.24).

swers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Barbour*, 63 F.3d at 36 (quoting Fed.R.Civ.P. 56(c)). To prevail on summary judgment, the moving party must show that there is an absence of evidence to support the non-moving party's position. *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir.1990); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party satisfies this requirement, the burden shifts to the non-moving party to establish the existence of at least one factual issue that is both genuine and material. *LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 841 (1st Cir.1993); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To oppose summary judgment successfully, the non-moving party "may not rest upon mere allegation or denials of his pleading," but must set forth specific facts showing that there is a genuine issue for trial. *LeBlanc*, 6 F.3d at 841 (quoting *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505). If the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *Rogers*, 902 F.2d at 143 (quoting *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505) (citations omitted). The Court must "view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Barbour*, 63 F.3d at 36.

### B. The § 1983 Equal Protection Claim

■ Plaintiffs claim that Leedberg and the City of Brockton made a race-based decision to deprive them of a public service "due to the opinion of the dispatcher that there was no merit to the call other than another histrionic white person wrongfully suspecting a minority of wrongdoing."

(Pariseau & Diaz Compls. Counts I and II). There are two essential elements to a § 1983 claim:

> First, the challenged conduct must be attributable to a person acting under color of state law . . .; second, the conduct must have worked a denial of rights secured by the Constitution or by federal law. The second element requires the plaintiff to prove not only a deprivation of federal right, but also that the defendant's conduct was a cause in fact of the alleged deprivation.

*Soto v. Flores*, 103 F.3d 1056, 1061–62 (1st Cir.1997) (citations omitted). Plaintiffs claim that the police officer's failure to dispatch the cruiser was a denial of rights secured by the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

■ The Fourteenth Amendment mandates that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Supreme Court has "clearly establishe[d] that the state does not have a constitutional duty to protect its citizens from private violence." *Soto*, 103 F.3d at 1063 (citing *DeShaney*, 489 U.S. at 197, 109 S.Ct. 998). However, *DeShaney* also noted, "The State may not, of course, deny its protective services to certain disfavored minorities without violating the Equal Protection Clause." *DeShaney*, 489 U.S. at 197 n. 3, 109 S.Ct. 998 (citing *Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886)). Thus, although there is no constitutional right to police protection, law enforcement officials may not selectively deny protective services based on such invidious classifications as race, gender, and religion. *Hayden v. Grayson*, 134 F.3d 449, 452, 453 n. 3 (1st Cir.1998); *Hilton v. City of Wheeling*, 209 F.3d 1005, 1007 (7th Cir.2000) ("[S]elective withdrawal of police protection, as when

the Southern states during the Reconstruction era refused to give police protection to their black citizens, is the prototypical denial of equal protection.") Where there is a claim of a race-based invidious classification, Plaintiffs must prove that the police officer acted with discriminatory intent. *Hayden,* 134 F.3d at 452.

■ Plaintiffs' first claim is that they were treated differently because of their race. However, Plaintiffs' equal protection claim does not fit within the "disfavored minority" line of cases, because there is no evidence that the police delayed sending the cruiser with discriminatory intent towards Plaintiffs because of their race. Indeed, there is no evidence that Leedberg, who is white, even knew the plaintiffs' race (white) at the time she decided not to dispatch a cruiser. Even if the police had known Plaintiffs' race, discrimination against one's own race is not readily inferred. *Hilton,* 209 F.3d at 1007 (pointing out that where all parties to the case were white, there was no suggestion that the plaintiff was being discriminated against because of his race).

■ Alternatively, Plaintiffs argue that Leedberg treated their calls complaining about young black suspects differently than she would have treated similar calls complaining about young white suspects engaging in the same conduct. This argument invokes another line of equal protection case law. The Equal Protection Clause safeguards not merely against invidious classifications such as race, but also against "any arbitrary classification of persons for unfavorable governmental treatment." *Hayden,* 134 F.3d at 453 n. 3. Although the Equal Protection Clause is more commonly invoked on behalf of a person who belongs to a vulnerable group, it also "gives rise to a cause of action on behalf of a 'class of one' where the plaintiff [does] not allege membership in a class or

group" but asserts "that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech,* 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000) (holding that a homeowner alleging that she was arbitrarily deprived of a water connection because of ill will generated by prior litigation stated a claim for relief under rational equal protection analysis). The *Willowbrook* court reiterated, "[T]he purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Id.* at 564, 120 S.Ct. 1073 (citation omitted). Thus, to prevail under *Willowbrook,* Plaintiffs must prove that the police (1) intentionally treated them differently (2) from others similarly situated (3) without a rational basis for the difference in treatment. *See id.*

■ Plaintiffs' claim does not survive the *Willowbrook* equal protection analysis because there is no evidence of discriminatory intent. The arbitrariness of a law enforcement decision is not, without more, sufficient to state an equal protection claim. Otherwise, there would be a viable equal protection claim whenever differential treatment was the result of "prosecutorial discretion honestly (even if ineptly—even if arbitrarily) exercised." *Id.* at 565, 120 S.Ct. 1073 (Breyer, J. concurring) (quoting *Olech v. Vill. of Willowbrook,* 160 F.3d 386, 388 (7th Cir.1998) (discussing *Esmail v. Macrane,* 53 F.3d 176, 179 (7th Cir.1995) (involving a spiteful denial of a renewal of a liquor license))). Instead, Plaintiff must produce evidence of "purposeful discrimination" in cases involving less invidious arbitrary classification. *See*

*Hayden v. Grayson*, 134 F.3d at 454 (holding that there was no evidence a police officer intended to treat sexual abuse crimes differently from nonsexual crimes). "The burden is an onerous one: 'Discriminatory purpose' ... implies that the decisionmaker ... selected or reaffirmed a course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.* (internal quotation marks and citations omitted). Even if the decision not to dispatch a cruiser immediately lacked a rational basis, the equal protection claim cannot succeed unless Plaintiffs can make a threshold showing of the requisite discriminatory intent. There is no evidence here that Leedberg embarked on a purposeful scheme not to protect white complainants or to decline police protection to persons making allegations regarding potential black perpetrators.

■ Further, there is no evidence of a custom or policy within the BPD motivating Leedberg's decision to provide less protection to victims of a particular kind of crime. *Cf. Soto*, 103 F.3d at 1066 (holding that a domestic violence plaintiff alleging gender discrimination in the provision of police services "must show that there is a policy or custom of providing less protection to victims of domestic violence than to victims of other crimes, that gender discrimination is a motivating factor, and that [the plaintiff] was injured by the practice"). Leedberg's poor judgment call (if the allegations are true) is not indicative of a discriminatory policy or custom within the Brockton Police Department. *McKee v. City of Rockwall, Tex.*, 877 F.2d 409, 415–16 (5th Cir.1989) ("We have indicated in other contexts that a single incident, when unaccompanied by supporting history, will frequently be an inadequate basis for inferring a policy.") To the contrary, Lieutenant Robert J. DiCarli, the shift commander at the BPD on the night in question, testified that in his judgment, a cruiser should have been sent to Tedeschi's based on the information transmitted to the dispatchers. (DiCarli Dep. Tr. at 25, 36–38.) Similarly, the testimony of the BPD Chief of Police, Paul F. Studenski, that the suspicions of a convenience store customer as to three black males wearing hoods "would be enough for [him] to put a call in to send somebody by" the location reveals yet a second, high-ranking officer's difference of opinion from that of Leedberg. (Studenski Dep. Tr. at 74–75.) Thus, there is no evidence to support Plaintiffs' allegation that the BPD embarked on a course of protecting a group of persons (those who complain about suspicious black individuals) less well than another (those who complain about suspicious white individuals).

■ Finally, "in the absence of invidious discrimination or the abuse of a fundamental right, a party may establish an equal protection violation with evidence of bad faith or a malicious intent to injure." *Rubinovitz v. Rogato*, 60 F.3d 906, 911 (1st Cir.1995); *see also Olech*, 160 F.3d at 387 (holding that the equal protection clause can be invoked "by a person who can prove that 'action taken by the state ... was a spiteful effort to 'get' him for reasons wholly unrelated to any legitimate state objective'") (quoting *Esmail*, 53 F.3d at 180). There is no indication that Leedberg harbored any vindictive feelings against these particular plaintiffs.

In sum, while there is evidence of inept law enforcement, Plaintiffs have not demonstrated that the conduct of Leedberg violated the Equal Protection Clause of the Fourteenth Amendment.

## IV. ORDER

The Court ***ALLOWS*** Defendants Brockton and Leedberg's Motions for Summary

Judgment (Pariseau Docket # 25 & Diaz Docket # 16) as to Plaintiffs' denial of equal protection claim, and **_DISMISSES_** without prejudice Plaintiffs' state law negligence claims against Defendants Brockton and Tedeschi for lack of subject matter jurisdiction.