Rosemarie WALSH, Plaintiff,

v.

TOWN OF LAKEVILLE
et al., Defendants.

Civil Action No. 02–12003–NMG.

United States District Court,
D. Massachusetts.

April 10, 2006.

**138**

Margaret A. Ishihara, Law Office of Margaret A. Ishihara, Mattapoisett, MA, for Plaintiff.

Joseph L. Tehan, Jr., Katharine Isabel Doyle, Kopelman & Paige, PC, Boston, MA, for Defendants.

## MEMORANDUM & ORDER

GORTON, District Judge.

In the instant dispute, Rosemarie Walsh ("Walsh") alleges that the defendants, the Town of Lakeville, Massachusetts ("the Town"), Manuel G. Mello ("Mello"), Pietro Panettieri ("Panettieri"), Edward P. Gibney ("Gibney"), William E. Garvey, Jr. ("Garvey"), Joseph J. Beneski ("Beneski"), Gerald R. White ("White"), Richard F. La-Camera ("LaCamera"), Chawner Hurd ("Hurd") and Robert M. Darling ("Darling")(collectively "the defendants") violated her federal and state civil rights. Walsh also claims that defendant LaCamera defamed her by making a false statement about her at a public meeting which was reported in an area newspaper. The defendants move separately for summary judgment and the Court resolves the motions as follows.

## I. *Background*

### A. Facts

Walsh has owned ten properties in the Town of Lakeville. This suit emanates from her ownership of three of those properties.

### 1. Hackett Avenue Property

In October, 1999, Walsh purchased a house located at 105 Hackett Avenue, Lakeville, Massachusetts. Walsh claims that, similar to the other houses in the vicinity, the Hackett Avenue property was used as a year-round residence prior to her purchase of the property.

After purchasing the Hackett Avenue property, the plaintiff took steps to upgrade the sewage disposal system on the property. On or about December 13, 1999,

Walsh had a percolation test done on the Hackett Avenue property which was observed by a Lakeville Board of Health agent. The site failed the percolation test. Walsh then had her engineer design an alternative sewage system known as a tight tank.

On or about May 17, 2000, defendant Mello, the Town Board of Health Agent, filed a criminal complaint against Walsh for alleged violations relating to the sewage disposal system on the Hackett Avenue property. One of the alleged violations was pollution. Walsh claims that prior to the criminal complaint, the Town did not have reasonable grounds to believe that her property was the source of the alleged pollution. She asserts that the photographs shown to her by defendant Mello were taken during a rain storm and showed water running downhill from the street and not from the septic system. Walsh claims that Mello admitted that what he had seen did not look or smell like sewage. Moreover, Walsh's septic bill showed that the system was working on March 16, 2000. The application for the criminal complaint was publicized in area newspapers. A hearing on the complaint was scheduled for June 27, 2000. In the meantime, on May 24, 2000, at a Board of Health meeting, Walsh claims that one member of the Board, defendant Gibney, told her that the criminal complaint against her would be resolved if she agreed to a deed restriction of her Hackett Avenue property to seasonal use. Walsh refused to agree.

On June 8, 2000, Walsh submitted an application for approval of the tight tank system to the Lakeville Board of Health. At the Board of Health hearing on her application on June 21, 2000, one of the Board members stated that he would consider approving the permit if Walsh would agree to execute a deed restriction limiting the use of the Hackett Avenue dwelling to summer residence only. Walsh rejected that condition and the Board denied her permit for the tight tank system.

The hearing on the Town's criminal complaint was continued to July 21, 2000. At a July 1, 2000, meeting of the Board of Health, the Board decided to withdraw the criminal complaint against Walsh in order to pursue civil enforcement action. No Town representative appeared and the complaint was dismissed. Defendant Mello claims his failure to appear at the hearing was due to a scheduling mis-communication with the Lakeville Town Administrator, whom he mistakenly believed had cancelled the hearing.

On or about July 21, 2000, Walsh filed a complaint in the nature of certiorari in Plymouth Superior Court to overturn the Board of Health's decision denying her application for the tight tank system. In a letter dated August 31, 2000, the Board of Health Agent wrote to Walsh stating that the Board had approved the tight tank system but with the restriction that the property was to remain a seasonal property. That approval came after Walsh's engineer provided a septic system repair plan to the Board in a letter dated August 8, 2000, and was subject to approval by the Massachusetts Department of Environmental Protection ("DEP"). Walsh wrote a letter in response to the Board's approval dated September 22, 2000, proposing to add a restriction to the deed limiting the house to two bedrooms provided she could use the house year-round. On or about September 14, 2000, DEP approved the tight tank system for the Hackett Avenue property. In a letter dated January 19, 2001, the Lakeville Board of Health informed Walsh that it had approved the tight tank system conditioned upon a deed restriction that the Hackett Avenue property would remain a two bedroom dwelling

and that there would be no further expansion. The letter made no mention about restricting year-round residence of the property. Walsh recorded the deed restriction on February 14, 2001, and the Board of Health formally approved the tight tank system on February 20, 2001.

In 2001, Walsh put the Hackett Avenue property up for sale at the price of $259,000. In March, 2001, a prospective buyer was told by someone at Lakeville Town Hall that the property was seasonal and did not make an offer. When Walsh spoke with defendant Mello about the incident, he allegedly admitted that he had told a prospective buyer that the property was seasonal but agreed to review the matter further.

In 2002, despite the tight tank system at the Hackett Avenue property, Walsh reported to defendant Mello that the cesspool at the property located at 103 Hackett Avenue, owned by Lawrence Kenney ("Kenney"), had sewage overflow running from his property over her property and down to Long Pond. Walsh complained to Mello. When she asked Mello why the Town was not taking action against Kenney, she claims that Mello told her that, due to the fact that Kenney was going through a divorce, he was giving him a break.

## 2. Barberry Street Property

In June, 1999, Walsh purchased a house located at 9 Barberry Street, Lakeville, Massachusetts and began renovations on the property. The property consists of a 10,000 square foot lot on which a single family home is located. It is located about 1,600 feet from Long Pond. At that time, the water supply for that property was from a private water supplier and sewage was handled by cesspool. Walsh claims that other homes on and near Barberry Street, which are smaller than Walsh's,

have year-round use cesspools and private wells for their water supply. She contends that none of those properties received a special permit from the Town of Lakeville Zoning Board of Appeals for a conversion to a year-round home.

On June 30, 1999, Walsh filed an application for a building permit to perform work on her Barberry Street property, which was granted. When defendant Darling, the Lakeville Building Commissioner, discovered that Walsh was performing work beyond the scope of that permit, he sent her a letter instructing her to file a new application with an additional fee or face a work stoppage order. On August 11, 1999, Walsh filed an application to perform additional work on the property.

Walsh moved into the Barberry Street property in September, 1999, and the following month had an FDA approved individual potable water supply installed for year-round use. After that installation, defendant Beneski, then a member of the Lakeville Board of Health, came to Walsh's home unannounced and, according to Walsh, told her to get out of the house, which Walsh refused to do. On November 2, 1999, Walsh applied for a well permit.

Walsh alleges that in November, 1999, defendant Darling, the Town Building Commissioner, denied her application for an occupancy permit for the Barberry Street property despite the fact that she had received approval from various other inspectors including the plumbing inspector and the Fire Department. Walsh claims that the Building Commissioner took those permits but later told her he did not have them.

In or around January, 2000, Walsh met again with defendant Darling about a building permit application for a window at 9 Barberry Street. Walsh claims she asked him how much the application fee

was and Darling said "you don't have enough money to get a permit from me."

On or about July 25, 2000, Walsh again requested a well-drilling permit for the Barberry Street property because, Walsh claims, the DEP had found her private water supply to be contaminated. The Lakeville Board of Health denied her permit, stating that there was an adequate water supply. Walsh filed a complaint in Plymouth Superior Court seeking a reversal of the Board's decision.

In December, 2000, defendant Darling brought a criminal complaint against Walsh in connection with the Barberry Street property for unlawful occupancy of a building and conversion of a seasonal home to year-round use without approval. At the hearing in January, 2001, the clerk-magistrate dismissed the complaint (allegedly with Town Board approval) because of Walsh's pending civil case with the Board of Health.

In February, 2001, Walsh informed the Town's attorney of several instances of well permits being granted to others who had situations similar to her own. On April 2, 2001, the Board of Health issued a well permit, with certain restrictions, for the Barberry Street property.

Walsh filed an application for a permit to repair the septic system at 9 Barberry Street. In July, 2001, the Lakeville Board of Health informed Walsh that it would approve her application subject to a recorded deed restriction that there would be no increase in flow to the septic system. Based on that representation, Walsh executed such a deed restriction.

At about the same time, Walsh filed an application for a special permit to convert 9 Barberry Street to a year-round residence, although she doubted such a petition was required under the zoning laws. On September 6, 2001, defendant Mello, in his capacity as Health Agent, recommended to the Zoning Board of Appeals that they deny the request for conversion, stating that year-round usage would result in an increase in flow to the septic system.

On or about September 10, 2001, at a public meeting, the Lakeville Board of Selectmen discussed Walsh's application for a special permit for conversion of the Barberry Street property to a year-round residence. One of the selectmen, defendant LaCamera, stated that Walsh's Barberry Street property was in violation for not having proper building or plumbing permits for work that was done. That statement was recorded in the meeting minutes and published in area newspapers. Walsh claims the statement is false.

At the same meeting, the selectmen voted to recommend that Walsh's special permit application be denied because the conversion would overload the capacity of the land and further endanger the water quality for the neighbors. At the same meeting, the Selectmen voted to recommend approval of a special permit for another applicant (Ronald and Sherri Guerin) for the replacement of their existing home at 113 Hackett Avenue with a larger one.

On September 20, 2001, the Lakeville Zoning Board of Appeals held a hearing on Walsh's application. Walsh claims that defendant Darling was present at the meeting and, although he did not offer any information helpful to her application, assisted the Guerins with their presentation. On October 3, 2001, the Board of Appeals denied Walsh's application for a special permit for conversion of her Barberry Street property to year-round use but allowed the Guerins' application for a special permit. Walsh claims that because of the denial of her application, she lost a sale for the property on which she would have made a profit of $57,000.

### 3. Wildwood Road Property

In June, 1999, Alice Bradshaw ("Bradshaw"), a friend of Walsh, lost her home at 5 Wildwood Road to the bank. Walsh purchased the home from the bank and allowed Bradshaw to continue living there. Prior to Walsh's acquisition of the property, Bradshaw had lived there year-round for a number of years without any action against her by the Town. Nevertheless, by letter dated January 18, 2000, the Lakeville Board of Health ordered Walsh to have Bradshaw vacate the property because it was purportedly seasonal. Bradshaw subsequently re-purchased the Wildwood Road property and the Town took no further action to have Bradshaw removed.

### 4. Plaintiff's Claims

The plaintiff claims the defendants violated her right to equal protection by intentionally and wrongfully singling her out for adverse treatment while they did not take adverse action against those similarly situated. By treating her this way, plaintiff claims that the defendants have engaged in a scheme of harassment which interfered with the development, use and enjoyment of her properties and her right to petition government. Walsh alleges that harassment violated the Massachusetts Civil Rights Act, M.G.L. c. 12 §§ 11H and 11I. Walsh further claims that the statement made by defendant LaCamera at the Board of Selectmen meeting on September 10, 2001, with respect to her property at 9 Barberry Street being "in violation for not having proper building or plumbing permits", was false and defamatory.

### B. Procedural History

Walsh filed her complaint with this Court on October 15, 2002, and the case was assigned to Judge Lindsay. On September 10, 2003, Judge Lindsay entered an order addressing the defendants' motions to dismiss under Fed.R.Civ.P. 12(b)(6). In that Order Judge Lindsay: 1) dismissed the Town as a defendant from Count I with respect to all defendants serving in their official capacity with the exception of the members of the Board of Health, 2) dismissed the Town as a defendant from Count II, 3) denied the motion to dismiss of Panettieri, Gibney, Garvey and Beneski, 4) denied the motion to dismiss of Mello, 5) denied the motion to dismiss of Darling, 6) denied the motion to dismiss of White, LaCamera and Hurd and 7) allowed the motion to dismiss of the Town of Lakeville Zoning Board of Appeals.

On June 24, 2004, the case was reassigned to this session. On September 9, 2005, the remaining defendants moved separately for summary judgment (Docket Nos. 75, 76, 77, 78 and 79). Each motion is supported by a separate memorandum. The plaintiff filed three memoranda in opposition (Docket Nos. 89, 90 and 91) which address the various arguments raised by the defendants. Because defendants' motions and memoranda contain similar arguments, the Court will address them conjointly.

## II. Legal Standard for Summary Judgment

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir.1991)(quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir.1990)). The burden is upon the moving party to show, based upon the pleadings, discovery and affidavits, "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* A genuine issue of material fact exists where the evidence with respect to the material fact in dispute "is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

Once the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine, triable issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court must view the entire record in the light most hospitable to the non-moving party and indulge all reasonable inferences in that party's favor. *O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir.1993). If, after viewing the record in the non-moving party's favor, the Court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law, summary judgment is appropriate.

### III. *Plaintiff's Equal Protection Claim*

Walsh alleges that the defendants violated her constitutional right to equal protection through their efforts to "intentionally and wrongfully" single her out for "adverse treatment". Such alleged adverse treatment includes: 1) bringing criminal complaints against her, 2) wrongfully denying her permits, 3) attempting to compel her to impose restrictive covenants on her properties, 4) taking action to remove one of her tenants because the subject property was deemed limited to seasonal use by the defendants and 5) ordering her and her family to vacate their Barberry Street home without cause.

Walsh alleges that the defendants took those adverse actions against her but not against others "similarly situated", thereby violating her right to equal protection of the laws under the Fourteenth Amendment to the United States Constitution. Although Walsh's complaint makes only passing mention of 42 U.S.C. § 1983 as a grounds for jurisdiction, her equal protection claim is styled in the form of a claim brought under that statute and, thus, despite her failure to state explicitly the statutory authority for it, the Court will analyze the claim under that rubric.

### A. "Class of One"

After maintaining throughout discovery that the defendants had discriminated against her on the basis of her gender and her daughters' Native American heritage, Walsh changes gears in her opposition to the motion for summary judgment and now claims that she is a "class of one" and has been "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000). Thus, to prevail on a "class of one" discrimination argument under *Willowbrook*, Walsh must prove that the defendants 1) intentionally treated her differently 2) from others similarly situated and 3) without a rational basis for the difference in treatment. *See Pariseau v. City of Brockton*, 135 F.Supp.2d 257, 263 (D.Mass.2001).

In a terse *per curiam* opinion, the Supreme Court took pains in *Willowbrook* to state that, although it affirmed the judgment of the Seventh Circuit Court of Appeals, its own holding did not reach the "subjective ill will" element relied on by the Seventh Circuit in reaching the earlier judgment. *Willowbrook*, 528 U.S. at 565, 120 S.Ct. 1073. However, in the lone con-

curring opinion, Justice Breyer expresses his serious concern that the Court's holding in *Willowbrook* "would transform many ordinary violations of city or state law into violations of the Constitution." *Id.* (Breyer, J., concurring). He continues:

It might be thought that a rule that looks only to an intentional difference in treatment and a lack of a rational basis for that different treatment would work such a transformation. Zoning decisions, for example, will often, perhaps almost always, treat one landowner differently from another, and one might claim that, when a city's zoning authority takes an action that fails to conform to a city zoning regulation, it lacks a "rational basis" for its action (at least if the regulation in question is reasonably clear).

*Id.* Justice Breyer concludes, however, that his concerns with the *per curiam* opinion were allayed by the Seventh Circuit's decision to require an extra factor which it called "vindictive action", "illegitimate animus", or "ill will," *Id.* at 566, 120 S.Ct. 1073, and that:

In my view, the presence of that added factor in this case is sufficient to minimize any concern about transforming run-of-the-mill zoning cases into cases of constitutional right.

*Id.*

Within the First Circuit there has been some ambivalence about the *Willowbrook* decision. The Court of Appeals has reprised the *per curiam* holding in *Willowbrook* that courts should carry out the "class of one" discrimination analysis "without regard to subjective motivation." *Burns v. State Police Ass'n of Mass.*, 230 F.3d 8, 12 n. 4 (1st Cir.2000). Nevertheless, in *Barrington Cove Ltd. Partnership v. Rhode Island Housing and Mortgage Finance Corp.*, 246 F.3d 1 (1st Cir.2001), the First Circuit stated that, in order to establish an equal protection claim, a plaintiff must prove that

compared with others *similarly situated*, [she] was selectively treated … based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or *bad faith* intent to injure a person.

*Id.* at 7 (emphasis in original)(quoting *Rubinovitz v. Rogato*, 60 F.3d 906, 909–10 (1st Cir.1995)). Moreover, in 2004, the First Circuit relied on *Barrington Cove* as good law and cited Justice Breyer's concurring opinion in *Willowbrook* as support for including the subjective element in the equal protection analysis. *See Tapalian v. Tusino*, 377 F.3d 1, 5–6 (1st Cir.2004).

This Court is left in the tenuous position of attempting to harmonize seemingly antithetical case law. The best place to start is with the *Willowbrook* decision itself. Justice Breyer's concurrence appears to view the Supreme Court's *per curiam* opinion in a light unpopular with the other justices. Nevertheless, it is important to consider that although the Supreme Court did not affirm the "vindictive action" portion of the Seventh Circuit's *Willowbrook* opinion, it did not overrule it either. *See Willowbrook*, 528 U.S. at 565, 120 S.Ct. 1073 ("We therefore affirm the judgment of the Court of Appeals, but do not reach the alternative theory of 'subjective ill will' relied on by that court."). Moreover, the First Circuit's opinion in *Tapalian* (in which *Willowbrook* is most recently cited) indicates that the subjective element is a factor that this Court must consider in equal protection cases like the one at bar.

█ Walsh does not allege that, compared with others similarly situated, the defendants selectively treated her differently because of race, religion or an intent to inhibit or punish the exercise of consti-

tutional rights but, rather, because of malicious or bad faith intent to injure her. Specifically, Walsh alleges that the defendants "intentionally and wrongfully singled [her] out ... for adverse treatment." Thus, with respect to Walsh's equal protection claim against the defendants, this Court will determine whether she has offered evidence sufficient to prove 1) that she was intentionally treated differently 2) from others similarly situated 3) without a rational basis for that difference in treatment *and* 4) that the difference in treatment was due to malicious or bad faith intent on the part of the defendants to injure her.

### B. Application of the Malice/Bad Faith Standard

■ The First Circuit has stated that a malice/bad faith test, when applied to a defendant's conduct in the context of a "class of one" equal protection claim, is "an exceptionally deferential one." *Wojcik v. Mass. State Lottery Comm'n,* 300 F.3d 92, 104 (1st Cir.2002). Moreover, the malice/bad faith standard is very high and must be "scrupulously met." *Rubinovitz v. Rogato,* 60 F.3d 906, 911 (1st Cir.1995)(citing cases to show standard). The First Circuit has required proponents of such an equal protection claim to establish a "gross abuse of power, invidious discrimination or fundamentally unfair procedures." *Baker v. Coxe,* 230 F.3d 470, 474 (1st Cir.2000). In fact, "even an arbitrary denial of a permit in violation of state law—even in bad faith—does not rise above the threshold for equal protection" claims. *Id.* The First Circuit noted in *Baker:*

> We have thus observed a marked difference between the inevitable misjudgments, wrongheadedness, and mistakes of local government bureaucracies and the utterly unjustified, malignant, and

extreme actions of those who would be parochial potentates.

*Id.*

The case of *Rubinovitz v. Rogato* is illustrative of the way the First Circuit has applied the malice/bad faith standard to a set of facts far more compelling than those in the case at bar. In that case, a city official was alleged to have engaged in a vendetta against a landlord who had evicted her friend by enlisting other local government officials from various departments to cut off the landlord's gas, water and sewage services, to charge the landlord with building code violations and to frustrate relations with a contractor. *See id.* at 908–09. Not only did the spurned tenant's avenger wreak havoc on the landlord in multiple ways but there was not the slightest trace of any legitimate government purpose to be served. Moreover, there was evidence that at least one of the defendants had used language indicative of malice when he referred to the plaintiffs as "bad people" and referred to the female plaintiff as "a bitch". The First Circuit held that:

> *Rubinovitz,* in which we acknowledged that plaintiff had adduced "only barely enough evidence" to survive summary judgment, illustrates the extreme "malicious orchestrated campaign" needed to surmount the constitutional threshold.

*Baker,* 230 F.3d at 474 (quoting *Rubinovitz,* 60 F.3d at 912).

Given that standard, Walsh's equal protection claim against the defendants fails. In many instances, there is no evidence that Walsh was similarly situated to those from whom she claims disparate treatment. In those instances where Walsh has offered evidence of property owners in Lakeville who were similarly situated to her but were treated differently, the defendants have offered rational reasons to support their actions.

■ Moreover, Walsh has proffered no evidence of "malicious or bad faith intent" on the part of the defendants to injure her. Even if some of the defendants' actions lacked a rational basis and resulted in Walsh being treated differently from others similarly situated, she has offered nothing to show that the defendants engaged in an orchestrated and spiteful effort to "get" her. *See Willowbrook*, 528 U.S. at 566, 120 S.Ct. 1073 (Breyer, J., concurring)(citing *Esmail v. Macrane*, 53 F.3d 176 (7th Cir.1995), which involved a campaign of severe harassment orchestrated by a mayor). Although Walsh alleges a vast conspiracy by Town officials against her, the evidence indicates nothing of the sort.

Walsh does not acknowledge the fact that the primary reason her property developments came to the attention of the defendants time and again was because of her violations of Town ordinances and regulations. Such violations include: 1) her acknowledged attempt to install a well at her Barberry Street property without the proper well-drilling permit, 2) occupying the Barberry Street property without an occupancy permit and 3) failure to respond to a Board of Health Order to replace the septic system at her Hackett Avenue property and to vacate the premises until such system was replaced.

Walsh cannot argue that Lakeville officials treated her maliciously when much of the adverse treatment to which she was subjected was due to her own improper or illegal conduct and failure to heed official warnings.[1] Moreover, far from singling out Walsh for selective treatment, her infractions were usually brought to the attention of Town officials via the complaints of her own neighbors. In essence, Walsh has failed to demonstrate to this Court a gross abuse of power or an extreme, malicious, orchestrated campaign against her by the defendants.

Walsh has made specific factual allegations against each of the defendants but a close examination of those allegations makes clear that they fall well short of the very high standard for a "class of one" equal protection claim based on malice and bad faith. Those allegations fail either because she has been unable 1) to identify others "similarly situated" to her, 2) to prove knowledge on the part of the defendants of others who were so similarly situated, 3) to demonstrate that the alleged adverse treatment she received lacked a rational basis or 4) to show gross abuse of power, personal hostility, extreme vindictive action, illegitimate animus or ill will by the defendants towards her. A few examples are representative.

Walsh claims that the members of the Board of Selectmen intentionally treated her differently from others similarly situated when they made a recommendation to the Zoning Board of Appeals to deny her application for a special permit to convert her Barberry Street residence to year-round use while recommending approval of the demolition of a nearby seasonal home so that the owners, the Guerins, could construct a larger house. Walsh filed her application, pursuant to Section 7 of the Lakeville Zoning Bylaws, for a seasonal conversion special permit. The Guerins filed their petition, pursuant to Section 6.1.3 of the Bylaws, for a special permit to replace a pre-existing, non-conforming

---

1. In fact, in one instance, defendant Darling stated explicitly in a letter to Walsh dated March 14, 2000, that her continued occupancy of the Barberry Street property without an occupancy permit could lead to the filing of a criminal complaint against her. Walsh chose to ignore that warning for many months and the complaint was issued against her in December, 2000.

dwelling with a larger one at their property at 113 Hackett Avenue. The applications from Walsh and the Guerins were brought under different sections of the Bylaws for different kinds of permits. Thus, Walsh was not similarly situated to the Guerins.

In fact, the data provided by the Town shows that, in the past 20 years, of 39 seasonal conversion special permit applications reviewed by the Board of Appeals, 30 were granted. However, only three of the 30 approved applications were for lots under 20,000 square feet. This was due to the fact that the Board of Selectmen has consistently recommended against allowing conversion permits for lots that small. Walsh's Barberry Street property contains 10,000 square feet.

Walsh alleges that, in November, 1999, Darling denied her application for an occupancy permit for the Barberry Street property. She alleges that Darling denied her request purportedly because she did not have approvals from the Lakeville plumbing inspector or Fire Department.[2] Walsh asserts that she did have those approvals and that Darling misappropriated those permits and later denied that he had them. Although Walsh implies that there were sinister motives behind Darling's conduct, her evidence demonstrates nothing more than disorganization on his part, hardly a "gross abuse of power".

Walsh alleges that in January, 2000, when she sought a permit for a window at her Barberry Street property, Darling told her that "she did not have enough money to get a permit from him". Darling's statement can be interpreted in more than one way but, in the absence of some further evidence that there was a history of animus between Darling and Walsh, that statement cannot establish an extreme, gross abuse of power. Moreover, Walsh has not offered evidence that there were others seeking building permits who were treated differently. Without such evidence, her proof is insufficient.

With respect to the Wildwood Road property, the treatment Walsh received from the Board of Health had a rational basis. Specifically, Bradshaw was allowed, due to her age and disability, to live on the Wildwood Road property year-round despite a deed restriction limiting the property to seasonal use. However, the Board of Health had previously stated that, upon Bradshaw's conveyance of the property to another party, it would revert to seasonal use. When Walsh bought the property, the permission to use the property for year-round occupancy ended. Later, when Bradshaw re-purchased the property, the Board of Health's qualified permission to use it year-round was restored. Animus towards Walsh played no role in the Board's decision.

Walsh mentions that six days before the Health Agent filed a criminal complaint against her for violating housing and environmental regulations, a letter she wrote criticizing defendant Gibney was published in the local Lakeville newspaper. Walsh argues that the letter gave Gibney a motive to file criminal charges against her. However, Walsh 1) fails to appreciate that Gibney is only one vote of three on the Board of Health, 2) has not offered any evidence to demonstrate that Gibney was influenced by that letter and 3) glosses over the fact that it was Mello, not Gibney, that filed the criminal complaint against her for reported violations at her Hackett

---

2. In fact, Darling's letter to Walsh, dated November 22, 1999, stated that she could not be approved for an occupancy permit until she had an approved water supply for year-round use and that Walsh would "need to have final inspections by the Fire Department for smoke detector compliance and by the Wiring Inspector, and Board of Health approval."

Avenue property. Moreover, Walsh fails to address the real reason for the criminal complaint, namely her violation of a Board of Health Order concerning her Hackett Avenue property and complaints about her use of the property from her neighbors.

Walsh alleges that one of the Board of Health members, defendant Beneski, appeared at her Barberry Street property on a Sunday in October, 1999, and told her to "get out of the house", which she refused to do. Beneski claims that during his unannounced visit, he told Walsh that she could not install a well without a permit, that she needed to have water supplied to the property and that she could not live in the house without water. If Walsh's allegation is believed, Beneski's actions may give rise some kind of claim but they do not amount to an equal protection violation. Walsh ignores the critical fact that Beneski was alerted to her particular situation after receiving a telephone call from a Barberry Street resident complaining about Walsh's illegal well-drilling. The appropriate comparison of Beneski's treatment must be between Walsh and other property owners about whom he received complaints of illegal well-drilling. Walsh has proffered no such evidence.

Walsh alleges that defendant Mello treated her differently from others similarly situated without a rational basis when her Hackett Avenue neighbor, Kenney, allegedly had sewage running from his property down into Long Pond. Walsh claims that when she asked Mello if he was going to take action against Kenney, Mello stated that he was going to give Kenney a break because Kenney was going through a divorce. If believed, Walsh's evidence would indicate that Mello's statement sprung from an affirmative desire to help Kenney, not a negative intent to injure her. Thus, Walsh has not shown malicious or bad faith intent to *injure her* through differential treatment, as is required by the First Circuit's rigorous equal protection test.

In fact, one of Walsh's own factual allegations undermines her equal protection argument. She asserts that in February, 2001, following the Board of Health's denial of a well-drilling permit for her Barberry Street property, she informed the Town's attorney of several instances of well permits being granted to others who had situations similar to her own. On April 2, 2001, the Board of Health issued a well permit, with certain conditions, for the Barberry Street property. Far from implying bad faith, that incident indicates that where the Board of Health was informed that it was treating Walsh differently from others similarly situated, it sought to rectify the situation.

Walsh's evidence does not meet the high standard set by the First Circuit for a "class of one" equal protection claim based on malice and bad faith. Thus, summary judgment is appropriate with respect to the equal protection claims against the named Town officials.

## C. Town of Lakeville

No liability attaches to a governmental agency pursuant to a mere *respondeat superior* theory. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Rather, there must be "a direct causal link between the municipal policy or custom and the alleged constitutional deprivation." *Britton v. Maloney*, 901 F.Supp. 444, 449 (D.Mass.1995)(citing *City of Canton v. Harris*, 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)). For a plaintiff to prevail on a claim of municipal liability under § 1983, she must establish 1) there existed a municipal custom or policy of deliberate indifference to the commission of constitutional violations and 2) that cus-

tom or policy was the cause of, and moving force behind, the particular constitutional deprivation of which she is complaining. *Foley v. City of Lowell*, 948 F.2d 10, 14 (1st Cir.1991)(citing *Bordanaro v. McLeod*, 871 F.2d 1151, 1156 (1st Cir.1989)).

 Here, Walsh has offered no evidence that the Town, through the members of the Board of Health acting in their official capacities, had any municipal custom or policy of deliberate indifference to the commission of constitutional violations of the kind alleged by Walsh. Thus, Walsh's equal protection claim against the Town fails.

## IV. *Plaintiff's State Law Claims*

### A. Jurisdiction

 The Court is left with plaintiff's state law claims. The First Circuit Court of Appeals has held that

> [i]n a federal-question case, the termination of the foundational federal claim does not divest the district court of power to exercise supplemental jurisdiction, but, rather, sets the stage for an exercise of the court's informed discretion.

*Roche v. John Hancock Mut. Life Ins. Co.*, 81 F.3d 249, 256–57 (1st Cir.1996). When making the decision to decline supplemental jurisdiction, the trial court "must take into account concerns of comity, judicial economy, convenience, fairness, and the like." *Id.* at 257.

 In *Roche*, the First Circuit, in affirming the decision of the district court to retain state law claims after the federal claim supporting original jurisdiction had been dismissed, emphasized the following:

> The litigation had matured well beyond its nascent stages, discovery had closed, the summary judgment record was complete, the federal and state claims were interconnected, and powerful interests in

both judicial economy and fairness tugged in favor of retaining jurisdiction. *Id.* This case is analogous to *Roche*. It was filed in this Court on October 15, 2002, three and one-half years ago. Discovery has been completed, the summary judgment record is complete and the case is set for trial in just a few weeks. In the interests of "comity, judicial economy, convenience, fairness, and the like", this Court will resolve the case on the merits and will not dismiss it for lack of subject matter jurisdiction.

### B. Plaintiff's Massachusetts Civil Rights Claim

Walsh alleges that the defendants, through a scheme of harassment, interfered with or attempted to interfere with 1) her development, use and enjoyment of her properties and 2) her right to petition government. As a result, the plaintiff claims she is entitled to damages under M.G.L. c. 12, § 11I, the Massachusetts Civil Rights Act ("the MCRA").

 To establish a claim under the MCRA, a plaintiff must prove 1) her exercise or enjoyment of her rights secured by the Constitution or the laws of either the United States or the Commonwealth have been subjected to interference or attempted interference by the defendants and 2) that the interference or attempted interference was by "threats, intimidation or coercion". *Bally v. Northeastern Univ.*, 403 Mass. 713, 717, 532 N.E.2d 49 (1989). Those requirements under the MCRA are "coextensive with 42 U.S.C. § 1983, except that the Federal statute requires State action whereas its State counterpart does not." *Batchelder v. Allied Stores Corp.*, 393 Mass. 819, 822–23, 473 N.E.2d 1128 (1985).

 Massachusetts case law defines a "threat" as "the intentional exertion of pressure to make another fearful or

apprehensive of injury or harm." *Planned Parenthood League of Mass., Inc. v. Blake,* 417 Mass. 467, 474, 631 N.E.2d 985 (1994). Intimidation "involves putting in fear for the purpose of compelling or deterring conduct." *Id.* Coercion is "the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done." *Id.*

■■■ Walsh claims the defendants have engaged in a "scheme of harassment" to interfere with her rights, among them her right to petition government for a redress of grievances. There is absolutely no evidence offered by Walsh to demonstrate the veracity of that allegation. That claim is rebutted by Walsh's own factual allegations that she has repeatedly exercised her right to petition the government. In fact, the defendants note that, even after the events described in the complaint took place, Walsh has appeared before Town boards on issues relating to two properties. Apparently, Walsh equates her right to petition the government for redress with a guarantee that she will receive the relief requested. "The First Amendment guarantees the right to participate in the political process; it does not guarantee political success." *Cecelia Packing Corp. v. U.S. Dep't of Agric.,* 10 F.3d 616, 623 (9th Cir.1993).

Walsh also claims the defendants have engaged in a "scheme of harassment" to interfere with her development, use and enjoyment of her properties. Walsh does possess a constitutional "right to own land and to use and improve it according to [her] conceptions of pleasure, comfort or profit, and the exercise of liberty and the pursuit of happiness." *Bell v. Mazza,* 394 Mass. 176, 178, 474 N.E.2d 1111 (1985). A constitutional taking is not necessary in order to impinge on this right. *See id.* (concerning plaintiffs' claim of interference

with their right to use and improve their property by construction of a tennis court). Thus, in order for Walsh to succeed on her MCRA claim, she must demonstrate that the defendants interfered or attempted to interfere with her development, use and enjoyment of her properties through the use of "threats, intimidation or coercion".

### 1. Board of Selectmen Defendants

■■■ With respect to her allegations against the Board of Selectmen defendants, Walsh cannot demonstrate a violation of her rights under the MCRA. Specifically, Walsh states in her complaint that the Board of Selectmen did nothing more than make a recommendation that her special permit application for the Barberry Street property be denied. The Board of Selectmen did not itself act on the application, instead leaving that to the Zoning Board of Appeals which denied it. Merely recommending against granting a special permit doesn't evince the requisite threats, intimidation or coercion.

### 2. Building Commissioner Darling

■■■ Walsh alleges that defendant Darling: 1) brought a criminal complaint against her concerning her Barberry Street property, 2) told her that she did not have enough money to get a permit from him, 3) denied her an occupancy permit for her Barberry Street property and 4) had "appeared to assist the Guerins" with their application at the same Zoning Board of Appeals meeting where her own application was denied.

■■■ It is unclear how any of those allegations amount to threats, intimidation or coercion as defined by Massachusetts case law. Walsh has not shown any demonstrated animus on the part of Darling towards her. Moreover, enforcement of the law does not constitute threats, intimidation or coercion. *See, e.g., Sena v. Com-*

*monwealth,* 417 Mass. 250, 263, 629 N.E.2d 986 (1994)(holding that a threat to use lawful means to reach an intended result is not actionable under the MCRA).

 Even the worst allegation leveled by Walsh against Darling, namely that he told her she didn't "have enough money to get a permit" from him for a window at the Barberry Street property, although insensitive and impolitic, does not qualify as a threat, intimidation or coercion under Massachusetts case law. Direct violations of rights, even if unlawful, are not subject to liability under the MCRA unless they are accompanied by a further attempt to force the plaintiff to take some action. *See Freeman v. Planning Bd. of W. Boylston,* 419 Mass. 548, 565, 646 N.E.2d 139 (1995).

### 3. Board of Health Defendants and Health Agent Mello

Walsh's remaining MCRA allegations concern individual members of the Lakeville Board of Health and Health Agent Mello. Those allegations are that:

1) Mello brought an application for criminal charges against her for causing pollution with respect to her Hackett Avenue property, an action ultimately dismissed by the court;

2) members of the Board of Health tried to get her to sign a deed restriction on her Hackett Avenue property, which would have limited the property to seasonal use, as a condition of their approval of the septic system and then made implied threats that they would continue a criminal action against her if she did not sign the restriction;

3) the Board of Health denied her a well drilling permit for her Barberry Street property and only relented when she brought suit;

4) the Board of Health assured her that the septic system permit for her Barberry Street property only restricted the number of bedrooms but then turned around and wrote a letter to the Zoning Board of Appeals taking the position that the septic system was for seasonal use only;

5) members of the Board of Health and Mello attempted to evict her tenant, Bradshaw, at the Wildwood Road property shortly after she purchased that property but then backed off after Bradshaw re-purchased it; and

6) defendant Beneski came to her house unannounced on a Sunday afternoon in October, 1999, and ordered her to move out.

Similar to the MCRA allegations leveled against the selectmen and Darling by the plaintiff, many of the allegations against the Board of Health members and Mello can be easily dispatched.

 Enforcement of the law does not constitute a scheme of harassment, thus it is hard to see how Walsh's first allegation states a MCRA violation. Walsh's allegation with respect to the Wildwood Road property is irrelevant because she does not explain how any of the Board's actions constitute threats, intimidation or coercion. Walsh's third and fourth allegations are likewise irrelevant and certainly do not state claims for MCRA violations.

 Walsh's allegation that members of the Board of Health tried to get her to sign a deed restriction with respect to her Hackett Avenue property as a condition of their approval of the septic system fails as well. There is no evidence that such a proposal is unlawful and even if it were, there is no evidence that the action by the Board of Health members was coercive.

Specifically, the Supreme Judicial Court stated in its *Freeman* decision (in the context of a local planning board but equally

applicable to any local board with power over property issues):

> We doubt the Legislature contemplated that every legal error committed by a local planning board, having the intended effect of requiring a landowner to alter in some way his proposed use of his property, should necessarily give rise to liability under [the MCRA]. . . .

*Freeman,* 419 Mass. at 566, 646 N.E.2d 139. In *Freeman,* the Supreme Judicial Court found that there was no evidence that a local planning board attempted to coerce a landowner to forgo development of his property by approving his subdivision plan only on the condition that he include a document proposing that an intersection at the subdivision would be safe. The court held that although the planning board erroneously sought the concession, it was legitimately related to one of the purposes of subdivision development law. *Id.*

Likewise, the concession sought by the Board of Health from Walsh with respect to her Hackett Avenue property was legitimately related to the concerns the Board members had about the septic system at the property and public health. The Legislature never intended the MCRA to be used in such a way as to inhibit legitimate negotiations for the settlement of land use disputes. In fact, the insertion by the Legislature of the requirement of threats, intimidation or coercion was specifically intended to limit liability under the MCRA. *Freeman,* 419 Mass. at 565–66, 646 N.E.2d 139.

■ Walsh makes an additional claim that there was an "implied" threat by defendant Gibney at a Board of Health meeting on May 24, 2000, that if she did not sign the deed restriction for seasonal use for the Hackett Avenue property, the Town would not withdraw the criminal complaint against her. That presents a more problematic issue. Here, if Walsh's allegations are believed, Gibney appears to be engaging in inappropriate bartering with Walsh, suggesting that the criminal complaint would be resolved if Walsh agreed to a restrictive covenant. The criminal complaint involved alleged past infractions unrelated to the proposed deed restriction. A reasonable jury could conclude that Gibney's comments to Walsh at the Board of Health meeting were intimidating and/or coercive.

■ Walsh's allegation about the actions of defendant Beneski's conduct is also troubling. According to Walsh, Beneski appeared at her Barberry Street property on a Sunday in October, 1999, and told her to "get out of the house". Beneski responds that during his unannounced visit he told Walsh that she could not install a well without a permit, that she needed to have water supplied to the property and that she could not live in the house without running water. Notwithstanding the truth contest, if Walsh's allegation is believed, Beneski's words and actions could be construed as a threat and a violation of the MCRA.

■ Moreover, neither Gibney nor Beneski is entitled to qualified immunity. Public officials are not liable under the MCRA for their discretionary acts unless they have violated a right under federal or state constitutional or statutory law that was "clearly established" at the time. *See Duarte v. Healy,* 405 Mass. 43, 47, 537 N.E.2d 1230 (1989); *Howcroft v. City of Peabody,* 51 Mass.App.Ct. 573, 595, 747 N.E.2d 729 (2001). Based on the evidence presented by Walsh, this Court concludes that her right to use and enjoy her property was a clearly established right at the time Gibney and Beneski allegedly violated it. There is no basis to conclude that either defendant is entitled to qualified immunity on Walsh's MCRA claims.

Thus, indulging all reasonable inferences in Walsh's favor, this Court concludes that there are genuine issues of material fact with respect to the MCRA claims against Gibney and Beneski and summary judgment as to them is inappropriate. Otherwise, summary judgment will be entered in favor of all of the other defendants with respect to Walsh's MCRA claims.

### C. Plaintiff's Defamation Claim

Count III of the plaintiff's complaint alleges that a member of the Lakeville Board of Selectmen, Richard LaCamera, defamed her through comments he made at a public Board meeting on September 10, 2001, when Walsh's application for a special permit for conversion of her Barberry Street property to a year-round residence was discussed. According to the official minutes of that meeting, LaCamera stated that the property "has been in violation for not having proper building or plumbing permits for work that was done." That statement was later published in a local newspaper. In his argument for summary judgment, LaCamera asserts that 1) his statement was true and thus not defamatory and, in the alternative, 2) it was made as merely an opinion of the speaker and was conditionally privileged because the speaker in question, LaCamera, was a public official at the time performing official duties.

In order to prove defamation, the plaintiff must demonstrate 1) a false and defamatory communication 2) of and concerning the plaintiff which is 3) published or shown to a third party. *Dorn v. Astra USA*, 975 F.Supp. 388, 396 (D.Mass. 1997). The lodestar of Massachusetts defamation law is the axiom that truth is an absolute defense to defamation. *See Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n*, 142 F.3d 26, 42 (1st Cir.1998). A statement cannot be defamatory if it is substantially true. *Reilly v. Associated Press*, 59 Mass.App.Ct. 764, 770, 797 N.E.2d 1204 (2003)("when a statement is substantially true, a minor inaccuracy will not support a defamation claim").

In this case, LaCamera's statement about the Barberry Street property appears to be substantially truthful. Nevertheless, even if it were doubtful that Walsh was in violation of Town ordinances for not having proper building or plumbing permits for work done on her Barberry Street property, LaCamera's statement would, nevertheless, be protected. He asserts that he made the statement based on information that had been disclosed to the Board of Selectmen. In *Schultz v. Kelly*, 188 F.Supp.2d 38 (D.Mass.2002), another session of this Court held that "no statement of belief based upon a disclosed factual basis (even if that basis proves false) is actionable". *Id.* at 58. *See also Meaney v. Dever*, 170 F.Supp.2d 46, 62 (D.Mass.2001)(holding that a statement of opinion was insufficient to form the basis of a defamation claim against a public official)(reversed on other grounds).

In the context of this case, LaCamera's words are construed to be his opinion on the state of the law based on the facts disclosed to him. In light of the facts presented to the Court on this particular issue, no reasonable jury could find that LaCamera's statement was defamatory and, therefore, summary judgment for LaCamera is appropriate on this claim.

### ORDER

In accordance with the foregoing:

1) The Motion of Defendant Town of Lakeville for Summary Judgment (Docket No. 76) is **ALLOWED**;

2) The Motion of Defendants Manuel Mello, Pietro Panettieri, Edward Gibney, William Garvey, Jr., and Joseph

Beneski for Summary Judgment (Docket No. 77) is, with respect to Gibney and Beneski on Count II, **DENIED,** but is otherwise **ALLOWED;**

3) The Motion of Defendants Gerald White, Richard LaCamera and Hurd for Summary Judgment on Counts I and II (Docket No. 79) is **ALLOWED.**

4) The Motion of Defendant Robert Darling for Summary Judgment (Docket No. 75) is **ALLOWED;**

5) The Motion of Defendant Richard LaCamera for Summary Judgment on Count III (Docket No. 78) is **ALLOWED.**

So ordered.